GORDON AND LORNA KAUFMAN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 15997–09.                    Filed April 4, 2011.

In *Kaufman v. Commissioner*, 134 T.C. 182 (2010), we
granted R partial summary judgment, sustaining his disallow-
ance of charitable contribution deductions Ps claimed on
account of PW's grant to N of a facade easement burdening
their residence. Ps ask that we reconsider our grant of partial
summary judgment. We must also address PW's cash con-
tributions to N and R's determination of accuracy-related pen-
alties.

1. *Held*: We did not err in *Kaufman v. Commissioner*, *supra*,
in concluding that the contribution of the facade easement
failed as a matter of law to comply with the enforceability-in-
perpetuity requirements under sec. 1.170A–14(g)(6), Income
Tax Regs. We therefore affirm our grant of partial summary
judgment to R on the grounds set forth in that report and
shall deny Ps' motion to reconsider it.

2. *Held*, *further*, PW's 2003 cash payments to N were condi-
tional at the end of 2003 and therefore not deductible for
2003. *Held*, *further*, Ps may deduct PW's cash payments to N
for 2004.

3. *Held*, *further*, Ps are liable for an accuracy-related pen-
alty only on account of their negligence in deducting the 2003
cash payments for 2003.

*Frank Agostino*, *Julie Pruitt Barry*, *Eduardo S. Chung*,
*Eleanor E. Farwell*, *Michael Mattaliano*, and *Michael E.
Mooney*, for petitioners.

*Carina J. Campobasso*, for respondent.

HALPERN, *Judge*: Respondent determined deficiencies in,
and penalties with respect to, petitioners' Federal income
tax, as follows:[1]

|  |  | Penalties | |
| Year | Deficiency | Sec. 6662(a) | Sec. 6662(h) |
| 2003 | $39,081 | $1,097 | $13,439 |
| 2004 | 36,340 | - - - | 14,536 |

[1] Unless otherwise stated, section references are to the Internal Revenue Code in effect for
the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.
We round all amounts to the nearest dollar.

The deficiencies respondent determined result from his disallowance of petitioners' deductions for contributions of a facade easement burdening their residence (the facade easement) and of cash to the National Architectural Trust (NAT). The penalties are accuracy-related penalties relating to those deductions. By amendment to answer, respondent asserted an increased deficiency for 2004 of $37,248 and an increased section 6662 penalty for that year of $14,726.

Earlier in this case, respondent moved for summary judgment, which we granted in part, with respect to the facade easement contribution, and denied in part, with respect to the cash contribution and the penalties. See *Kaufman v. Commissioner*, 134 T.C. 182 (2010). Petitioners then moved for us to reconsider our grant of partial summary judgment. Several organizations receiving facade or other preservation easements and otherwise concerned with historic preservation asked permission to file briefs in support of petitioners' motion.[2] We took petitioners' motion under advisement, instructing the parties that we would proceed with a trial on the remaining issues in the case (the cash contribution and the penalties) and would address the motion following the trial. We instructed the parties to incorporate their arguments in support of, or in opposition to, the motion in their posttrial briefs. We denied the organizations' requests to file briefs but instructed them to work with petitioners to develop a coordinated position, which petitioners would set forth in their posttrial briefs. In their opening brief, petitioners assure us that it was prepared in accordance with our instruction. We therefore assume that petitioners' briefs incorporate petitioners and the organizations' joint position.[3]

We shall first set forth our findings of fact, which are necessary to dispose of the cash contribution issue and the penalties (and which should provide a useful background for our discussion of our grant of partial summary judgment). We shall then set forth our reasons for sustaining our grant of partial summary judgment and denying petitioners' motion

---

[2] The organizations are: Trust for Architectural Easements (formerly National Architectural Trust), Foundation for the Preservation of Historic Georgetown, National Trust for Historic Preservation, and Capitol Historic Trust.

[3] The Trust for Architectural Easements notified us that it joined relevant portions of petitioners' briefs.

to reconsider it; finally, we shall dispose of the remaining issues.

FINDINGS OF FACT

*Introduction*

Some facts are stipulated and are so found. The stipulation of facts and the second stipulation of facts, with accompanying exhibits, are incorporated herein by this reference.

At the time the petition was filed, petitioners resided in Massachusetts.

*Background*

Petitioners are husband and wife. Gordon Kaufman [4] is the Morris A. Adelman Professor of Management Emeritus of the Sloan School of Management at the Massachusetts Institute of Technology. Lorna Kaufman has a Ph.D. in developmental psychology from Boston College and is president of her own company.

*The Property*

In 1999, Lorna Kaufman purchased real property (the property) in Boston, Massachusetts. The property consists of a lot and a single-family residence (a rowhouse), which is petitioners' home. The property is in the South End historic preservation district.

*The October 13, 2003, Letter*

Lorna Kaufman received a letter dated October 13, 2003, from Mory Bahar (Mr. Bahar), an NAT area manager, thanking her for her inquiry about NAT's Federal historic preservation tax incentive program. Among other things, Mr. Bahar stated that the program allowed the owner of a nationally registered historic building to deduct between 10 and 15 percent of the value of the building on her Federal income tax return. He further stated that the program would require very little effort on her part because, as part of NAT's service, NAT "will be handling all the red tape and paperwork."

---

[4] Since both petitioners hold doctoral degrees, and both could thus be referred to as Dr. Kaufman, we shall avoid confusion by referring to them individually as Gordon Kaufman and Lorna Kaufman, respectively.

*The Application*

In late October or early November 2003, Lorna Kaufman submitted an application, the "Preservation Restriction Agreement Application" (the application), to NAT, on its own form, identifying the property as property to be considered for a preservation donation. On the application, she estimated the fair market value of the property as $1.8 million and identified Washington Mutual Bank FA (the bank) as holding a mortgage on the property. In pertinent part, the application states:

*Deposit*

A good faith deposit of $1,000 is required at the time of application. If for any reason the necessary approvals cannot be obtained, the deposit will be promptly refunded. The deposit should be made to * * * [NAT].

\* \* \* \* \* \* \*

*Donor Endowment*

When the Trust accepts a donation it pledges to monitor and administer the donation in perpetuity. Since the Trust receives no government funding and has no other source of income, it requires that donors create an endowment that covers current operating costs and funds the Trust's long term Stewardship Endowment which is reserved for future monitoring and administration purposes.

The cash endowment contribution is set at 10% of the value of the donation tax deduction * * *. * * * If the donation can not [sic] be processed in the timeframe required to qualify for a 2003 deduction, a 10% reduction in the cash contribution will be provided to the donor once the process is completed in 2004.

At the time she submitted the application, Lorna Kaufman made the required $1,000 deposit.

*The December 16, 2003, Letter*

Lorna Kaufman received a letter dated December 16, 2003, from James Kearns (Mr. Kearns), president of NAT. In pertinent part, the letter states:

We are pleased to inform you that we have completed our discussions with the Massachusetts Historical Commission and have reached agreement on a Preservation Restriction Agreement. * * *

In order to accept your donation in 2003, we ask that you agree to the following:

1. Deliver to the Trust by December 26, 2003:

  a. An executed and notarized Preservation Restriction Agreement,

  b. A signed copy of this letter, and

  c. A check for a cash contribution to the Trust of $15,840, which is based on 8% of the estimated easement valuation of $198,000 * * * . Since the final cash contribution is 10% of the easement value, it is expected that an additional contribution amount will be due and the donor promises to send a check for that amount within ten days of receipt of the final appraisal report. In the event the appraised value of the easement deduction generates a contribution amount less than the above calculated estimate, the Trust will refund the excess within ten days of receipt of the final appraisal report.

2. Schedule an appraisal within fifteen days of receiving this letter and ensure its completion by February 28, 2004.

3. The Trust must review the new Preservation Restriction Agreement with your lending institution(s) in order to ensure subordination according to its conditions.

4. In the event that the subordination of your mortgage(s) or historic certification can not [sic] be achieved, and/or your appraisal cannot be completed by February 28, 2004, you will join with the Trust in voiding the easement. In this circumstance, the Trust will reimburse you for any disbursements made in an effort to achieve an enforceable donation, including the cost of appraisal and your cash contribution to the Trust.

Once all the necessary steps have been completed, the Trust will provide you with an acknowledgment of your 2003 charitable contributions and the appropriate IRS form for you to submit with your tax return. The Trust will also arrange for the deed to be recorded * * *.

On December 29, 2003, Lorna Kaufman signed a copy of the letter under the notation "Concurrence" and returned it to NAT, along with a check for $15,840 dated December 27, 2003, drawn to NAT.

*The Agreement*

In December 2003, Lorna Kaufman entered into a preservation restriction agreement (the agreement) with NAT pursuant to which she granted to NAT the facade easement restricting the use of the property. The agreement recites its purpose:

It is the purpose of this Preservation Restriction Agreement to assure that the architectural, historic, cultural and open space features of the property will be retained and maintained forever substantially in their current condition for conservation and preservation purposes in the public interest, and to prevent any use or change of the Property that will significantly

impair or interfere with the Property's conservation and preservation values or that would be detrimental to the preservation of the Property.

That purpose is achieved by Lorna Kaufman's grant and conveyance to NAT by way of the agreement of "an easement in gross, in perpetuity, in, on, and to the Property, Building and the Facade, being a Preservation Agreement on the Property," with certain delineated rights. [5] In pertinent part, section IV.C. of the agreement also provides:

In the event this Agreement is ever extinguished, whether through condemnation, judicial decree or otherwise, Grantor agrees on behalf of itself, its heirs, successors and assigns, that Grantee, or its successors and assigns, will be entitled to receive upon the subsequent sale, exchange or involuntary conversion of the Property, a portion of the proceeds from such sale, exchange or conversion equal to the same proportion that the value of the initial easement donation bore to the entire value of the property at the time of donation * * *, unless controlling state law provides that the Grantor is entitled to the full proceeds in such situations, without regard to the Agreement. Grantee agrees to use any proceeds so realized in a manner consistent with the preservation purposes of the original contribution.

*The Lender Agreement*

At the time the agreement was entered into, the bank held a mortgage on the property. A representative of the bank executed a document styled "LENDER AGREEMENT" (lender agreement). The lender agreement was attached to and recorded with the agreement. The lender agreement references the property and, in pertinent part, provides:

[The bank] hereby joins in * * * [the agreement] for the * * * purpose of subordinating its rights in the Property to the right of * * * [NAT] to enforce * * * [the agreement] in perpetuity under the following conditions and stipulations:

  (a) The Mortgagee/Lender and its assignees shall have a prior claim to all insurance proceeds as a result of any casualty, hazard or accident occurring to or about the Property and all proceeds of condemnation, and shall be entitled to same in preference to * * * [NAT] until the Mortgage is paid off and discharged, notwithstanding that the Mortgage is subordinate in priority to the Agreement[.]

---

[5] The term "Preservation Agreement" in the quoted language probably should be read "Preservation Restriction", since the agreement earlier recites Lorna Kaufman's and NAT's reciprocal desires to grant and receive a "Preservation Restriction * * * as such term is defined in * * * [Mass. Ann. Laws ch. 184, secs. 31 and 32 (LexisNexis 1996 & Supp. 2010)]" (conservation and preservation restrictions).

The lender agreement was attached to the agreement, and the agreement was recorded in the Suffolk County, Massachusetts, registry of deeds on October 1, 2004.

*NAT's Assistance*

NAT assisted Lorna Kaufman in obtaining the bank's agreement to subordinate its mortgage to the facade easement by submitting the required documents to the bank and following up to ensure the bank's agreement. NAT provided Gordon Kaufman with a list of whom it considered to be qualified appraisers. It also negotiated the terms of the agreement with the Massachusetts Historical Commission and facilitated approval of the agreement by it, the City of Boston, and the National Park Service. Mr. Bahar answered basic inquiries by Gordon Kaufman about the deductibility of Lorna Kaufman's contribution.

*The Appraisal*

Timothy J. Hanlon prepared an appraisal of the property (the appraisal) as of January 20, 2004. He reported the value of the property to be $1,840,000 before the grant of the facade easement. He concluded: "The property is considered to have a reduction in fair market value of 12% of the property's value prior to the easement donation, which equates to a loss of $220,800 (rounded)."

*The Discount*

Lorna Kaufman received a letter dated April 5, 2004, from Victoria C. McCormick (Ms. McCormick), NAT vice president of operations and finance, addressing, in part, her "cash donation". Addressing an expected delay in petitioners' being able to file their 2003 joint income tax return on account of the then as-yet-uncompleted contribution of the facade easement, Ms. McCormick stated:

[*NAT*] *will discount your cash donation by 10%* as calculated below.

| | |
|---|---:|
| Appraised easement value ............................................... | $220,800 |
| Cash contribution at 10% of appraised easement value | 22,080 |
| Discount of 10% ................................................................ | 2,208 |
| Discounted cash contribution ........................................... | 19,872 |
| Washington Mutual fees .................................................. | 300 |

| | |
|---|---|
| Total amount due ............................................................... | 20,172 |
| Amounts paid to date ........................................................ | 16,840 |
| Net amount due ................................................................. | 3,332 |

No amount is due at this time. Your final payment of $3,332 will be due only after * * * [National Park Service] certification has been achieved.

### *Park Service Certification*

On August 9, 2004, the U.S. Department of the Interior, National Park Service, classified the property as a "certified historic structure" for charitable contribution for conservation purposes.

### *The Final Payment and Form 8283*

Lorna Kaufman paid NAT $3,332 by check received by it on August 17, 2004. On that date, it sent her an IRS Form 8283, Noncash Charitable Contributions, documenting her contribution of the facade easement. Ms. McCormick testified that donors to NAT were informed "up-front" that it "would give them the [Form] 8283 after the cash contribution was received."

### *Petitioners' Tax Returns*

Petitioners filed joint Federal income tax returns for 2003 and 2004. On their 2003 return, petitioners showed a charitable contribution of $220,800 for the contribution of the facade easement. Because of the limitations on charitable contribution deductions in section 170(b)(1)(C), petitioners claimed a charitable contribution deduction with respect to the facade easement of only $103,377. Petitioners also claimed a charitable contribution deduction of $16,870 for a cash contribution to NAT, notwithstanding that, during 2003, they paid NAT only $16,840.

On their 2004 return, petitioners claimed a carryover charitable contribution deduction of $117,423 related to the facade easement contribution. They also claimed a charitable contribution deduction of $3,332 on account of the $3,032 final installment of their "cash contribution" to NAT and $300 on account of the bank fee paid by NAT.

OPINION

I. *Reconsideration of Grant of Partial Summary Judgment*

A. *Introduction*

We granted partial summary judgment to respondent, sustaining his disallowance of any deduction for 2003 or 2004 for the contribution of the facade easement to NAT. We concluded that the contribution failed as a matter of law to comply with the enforceability-in-perpetuity requirements found in section 1.170A–14(g), Income Tax Regs. *Kaufman v. Commissioner*, 134 T.C. at 187. For that reason, we found that the facade easement contribution was not protected in perpetuity and so was not a qualified conservation contribution under section 170(h)(1). *Id.* Rule 161 affords us discretion to reconsider an opinion upon a showing of substantial error. *Estate of Quick v. Commissioner*, 110 T.C. 440, 441 (1998).

Petitioners argue that we should reconsider, and reverse, our grant of partial summary judgment because the agreement complies with the regulations. In particular, petitioners argue:

[The agreement] sets out the exact terms of the agreement between the donor and donee that are required by Treas. Reg. § 1.170A–14(g)(6), and the Lender Agreement includes the provision required by Treas. Reg. § 1.170A–14(g)(2). Separately, the Court should consider the application of Treas. Reg. § 1.170A–14(g)(3), which provides that a conservation interest will be regarded as "enforceable in perpetuity"—even if defeasible upon the happening of a future event—"if on the date of the gift it appears that the possibility that such act or event will occur is so remote as to be negligible."

Respondent answers that the agreement and the lender agreement must be read together, that it is insufficient for the agreements merely to parrot the regulations, and that, when read together, the agreements constitute a conveyance that fails to conform to the extinguishment provision found in section 1.170A–14(g)(6), Income Tax Regs. Respondent argues that the mortgage subordination requirements found in section 1.170A–14(g)(2), Income Tax Regs., are irrelevant, having been relied on neither by him in support of the motion for summary judgment nor by the Court in *Kaufman v. Commissioner*, 134 T.C. 182 (2010). Finally, respondent

argues that the requirements of section 1.170A–14(g)(3), Income Tax Regs., addressing remote future events, should not be read into the requirements of section 1.170A–14(g)(6), Income Tax Regs.

Before setting forth the pertinent details of section 170 and the regulations and discussing the parties' arguments, we shall provide some background information with respect to the difficulties in making a conservation restriction perpetual.

### B. *Perpetual Conservation Restrictions*

Under common law doctrines, it is difficult for a real property owner to split the Blackstonian bundle of rights constituting ownership of the property to give one not holding the remaining rights perpetual control over the use that may be made of the property. The principal difficulties are assignability and duration, common law disfavoring the creation of an assignable right of unlimited duration to control the use of land. See 4–34A Powell, Real Property, sec. 34A.01 (M. Wolf ed. 2010); Airey, "Conservation Easements in Private Practice", 44 Real Prop. Tr. & Est. L.J. 745, 750–758 (2010).

Statutory authority, however, to create assignable restrictions of unlimited duration for conservation, preservation, and similar purposes now can be found in the codes of every State and the District of Columbia. See 4–34A Powell, *supra* sec. 34A.01 n.1 (list). Indeed, the agreement both characterizes the facade easement as "an easement in gross", a common law interest, and references Mass. Gen. Laws ch. 184, secs. 31 and 32 (conservation and preservation restrictions).

Yet, as the Powell treatise makes clear, notwithstanding State law statutory provisions facilitating the creation of perpetual conservation restrictions, there are many means by which conservation restrictions may be modified or terminated. 4–34A Powell, *supra* sec. 34A.07[1]. Those include: Condemnation (eminent domain), the foreclosure of preexisting liens, foreclosure for unpaid taxes, Marketable Title Acts, merger or abandonment, the doctrine of changed conditions, and release by the holder. *Id.*

The Powell treatise states with respect to release: "Some statutes confirm the common-law principle that an easement

or covenant may be released by the holder." *Id.* It gives as an example Mass. Gen. Laws., ch. 184, sec. 32 (after a public hearing). *Id.* n.6.

It states with respect to condemnation: "Thus if a conservation easement restricts the development of real property that is needed for a school, hospital, or publicly aided housing, eminent domain may be exercised." *Id.* sec. 34A.07[2]. It notes that the method of valuation of the interest represented by the conservation restriction and whether and to whom compensation may be awarded are controversial issues, but it states that the better view, followed by most States, "is that the condemnation of an easement is the taking of an interest in property that requires compensation to the holder." *Id.*

It states that a conservation easement may be terminated without the consent of the holder:

> through the foreclosure of a pre-existing mortgage or mechanic's lien on property subsequently encumbered by the easement. Such a foreclosure, when consummated by a sale, will result in the termination of the easement. The purchaser takes title free of the restrictions imposed subsequent to the attachment of the lien. * * * [*Id.* sec. 34A.07[3].]

It recognizes that the doctrine of changed circumstances may apply to conservation restrictions: "An action for an injunction against the violation of a restrictive covenant will be defeated, if the owner * * * can show that conditions in the neighborhood have changed so substantially that the original purposes to be served by the restriction can no longer be achieved." *Id.* sec. 34A.07[6]; see also 2 Restatement, Property 3d (Servitudes), sec. 7.11 (2000). The Powell treatise states that a good case to be made for the inapplicability of the doctrine to conservation restrictions on policy grounds and references another commentator who suggests that, on the obsolescence of a conservation restriction, because of its public nature "the servient owner should either pay the easement holder the value of the easement or a court should attempt to reform the terms of the easement to preserve its purpose based on the doctrine of cy pres." 4–34A Powell, *supra* sec. 34A.07[6] (citing Note, "Conservation Easements and the Doctrine of Changed Conditions", 40 Hastings L.J. 1187, 1221 (1989)); see also 2 Restatement, *supra* sec. 7.11.

C. *Section 170 and the Pertinent Regulations*

Section 170 allows a deduction for any charitable contribution, subject to certain limitations, that the taxpayer makes during the taxable year. In general, section 170(f)(3) denies any deduction for a contribution of an interest in property that is less than the taxpayer's entire interest in the property. One exception to that general rule, however, is for a qualified conservation contribution. Sec. 170(f)(3)(B)(iii). Under section 170(h)(1), a qualified conservation contribution must be a contribution of a "qualified real property interest * * * exclusively for conservation purposes."[6] Under section 170(h)(2)(C), a qualified real property interest includes "a restriction (granted in perpetuity) on the use which may be made of the real property." Under section 170(h)(5)(A), "A contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity." See also sec. 1.170A–14(a), Income Tax Regs.

The regulations introduce the term "perpetual conservation restriction". Section 1.170A–14(b)(2), Income Tax Regs., states: "A perpetual conservation restriction is a qualified real property interest." It defines such restriction as "a restriction granted in perpetuity on the use which may be made of real property—including, [sic] an easement or other interest in real property that under state law has attributes similar to an easement (e.g., a restrictive covenant or equitable servitude)." *Id.*

Section 1.170A–14(g), Income Tax Regs., elaborates on the enforceability-in-perpetuity requirement. Paragraph (g)(1) requires generally that legally enforceable restrictions prevent use of the retained interest by the donor (and his successors in interest) inconsistent with the conservation purposes of the donation.

Paragraph (g)(2) addresses mortgages and, in pertinent part, provides that "no deduction will be permitted * * * for an interest in property which is subject to a mortgage unless the mortgagee subordinates its rights in the property to the right of the * * * [donee] organization to enforce the conservation purposes of the gift in perpetuity."

---

[6] The other requirement is that the contribution be to a "qualified organization". See sec. 170(h)(1)(B). Respondent concedes that, at the time of the contributions, NAT was a qualified organization under sec. 170(h)(3).

Paragraph (g)(3) is entitled "Remote future event" and addresses events that may defeat the property interest that has passed to the donee organization. It provides that a deduction will not be disallowed merely because on the date of the gift there is the possibility that the interest will be defeated so long as on that date the possibility of such defeat is so remote as to be negligible. *Id.*

Paragraph (g)(6) is entitled "Extinguishment" and recognizes that, after the donee organization's receipt of an interest in property, an unexpected change in the conditions surrounding the property can make impossible or impractical the continued use of the property for conservation purposes. Subdivision (i) of paragraph (g)(6) provides that those purposes will nonetheless be treated as protected in perpetuity if the restrictions limiting use of the property for conservation purposes "are extinguished by judicial proceeding and all of the donee's proceeds * * * from a subsequent sale or exchange of the property are used by the donee organization in a manner consistent with the conservation purposes of the original contribution."

Subdivision (ii) of paragraph (g)(6) is entitled "Proceeds" and, in pertinent part, provides:

for a deduction to be allowed under this section, at the time of the gift the donor must agree that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the donee organization, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift * * * bears to the value of the property as a whole at that time. * * * For purposes of this paragraph (g)(6)(ii), that proportionate value of the donee's property rights must remain constant. Accordingly, when a change in conditions give rise to the extinguishment of a perpetual conservation restriction under paragraph (g)(6)(i) of this section, the donee organization, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction * * *.

D. *Discussion*

1. *Introduction*

The drafters of section 1.170A–14, Income Tax Regs., undoubtedly understood the difficulties (if not impossibility) under State common or statutory law of making a conservation restriction perpetual. They required legally enforceable

restrictions preventing inconsistent use by the donor and his successors in interest. See sec. 1.170A–14(g)(1), Income Tax Regs. They defused the risk presented by potentially defeasing events of remote and negligible possibility. See sec. 1.170A–14(g)(3), Income Tax Regs. (sometimes, simply, the so-remote-as-to-be-negligible standard). They did not, however, consider the risk of mortgage foreclosure per se to be remote and negligible and required subordination to protect from defeasance. See sec. 1.170A–14(g)(2), Income Tax Regs. (sometimes, simply, the subordination requirement). They understood that forever is a long time and provided what appears to be a regulatory version of cy pres to deal with unexpected changes that make the continued use of the property for conservation purposes impossible or impractical. See sec. 1.170A–14(g)(6), Income Tax Regs. (sometimes, simply, the extinguishment provision). It is the extinguishment provision that directly concerns us here.

The following are uncontested facts. The bank held a mortgage on the property at the time Lorna Kaufman and NAT entered into the agreement. The lender agreement provides that the bank has "prior claim" to all insurance proceeds as a result of any casualty, hazard, or accident occurring to or about the property and all proceeds of condemnation. The lender agreement also provides that the bank was entitled to those proceeds "in preference" to NAT until the mortgage was satisfied and discharged.

In *Kaufman v. Commissioner*, 134 T.C. at 186, we found that NAT's right to its proportionate share of future proceeds was thus not guaranteed and, since we interpreted the extinguishment provision to lay down an unconditional requirement that the donee organization be entitled to its proportionate share of future proceeds, the agreement did not satisfy the terms of the provision. As a result, we in effect held that the agreement did not establish a perpetual conservation restriction, and the facade easement was not a qualified real property interest. *Id.* at 186–187. We found that Lorna Kaufman's contribution of the facade easement to NAT was not, therefore, a qualified conservation contribution within the meaning of section 170(h)(1).[7] *Id.* at 187.

---

[7] Our concern in *Kaufman v. Commissioner*, 134 T.C. 182 (2010), was with the allocation of proceeds on a sale or, exchange, or involuntary conversion of property following judicial extin-

Continued

2. *Petitioners' Arguments*

a. *The Agreement Contains the Necessary Language*

Petitioners argue that the requirements of the extinguishment provision are met if, in the event a conservation restriction is extinguished by judicial action and the underlying property is sold, the donee organization "has a contractual entitlement against the donor and his successors for the organization's proportionate share of the sales proceeds as defined in Treas. Reg. § 1.170A–14(g)(6)(ii)." Petitioners reference section IV.C. of the agreement, set forth above, and argue that the agreement "explicitly sets forth this entitlement." They conclude: "This is precisely what the Regulation requires, and all that it requires."

As to how NAT would fare if, for instance, the property were taken by condemnation following the extinguishment of the facade easement in a judicial proceeding, petitioners state: "If the entire property is the subject of a condemnation action, the mortgagee may have a priority right to condemnation proceeds under a Lender Agreement comparable to that involved in this case." That, they argue, "does not absolve the property owner [Lorna Kaufman] of * * * [her] obligation to make good on the easement-holding organization's [NAT's] entitlement to a pro-rata share of the proceeds realized from the sale or involuntary conversion of the property". With respect to the fact that the lender agreement stands the bank in front of NAT in line for a share of the condemnation proceeds, they explain: "The Lender Agreement defines priority to insurance and condemnation proceeds as between * * * [the bank] and * * * [NAT]; it has no effect on the donor or subsequent property owner." NAT, they explain, can still look to Lorna Kaufman or her successors in interest for reimbursement.

_____

guishment of a conservation restriction burdening the property. We did not then, nor do we now, rule on whether the language establishing the restriction must incorporate provisions requiring judicial extinguishment (and compensation) in all cases in which an unexpected change in surrounding conditions frustrates the conservation purposes of the restriction. Such a rule is suggested, however, by the last sentence in sec. 1.170A–14(c)(2), Income Tax Regs. ("Transfers by donee"), although the reference therein to "paragraph (b)(3)" probably should be to "paragraph (b)(2)" and the cross-reference to sec. 1.170A–14(g)(5)(ii) probably should be to sec. 1.170A–14(g)(6)(ii). See sec. 1.170A–13, Proposed Income Tax Regs., 48 Fed. Reg. 22941 (May 23, 1983) (apparently the Secretary failed to update the cross-references in the final regulations).

We shall accept petitioners' claim that the agreement gives NAT a contractual right against Lorna Kaufman and her successors for its proportionate share of the proceeds from the sale of the property following judicial extinguishment of the facade easement. In the face of the bank's priority under the lender agreement, however, we believe that right to be insufficient to satisfy the requirements of subdivisions (i) and (ii) of section 1.170A–14(g)(6), Income Tax Regs. (sometimes, simply, subdivision (i) or subdivision (ii)). Subdivision (ii) requires that the donor, at the time of the gift, must agree that the donation "gives rise to a property right * * * immediately vested in the donee organization". Subdivision (i), addressing generally the disposition of sale proceeds following judicial extinguishment of conservation restriction, speaks specifically of "the *donee's proceeds* * * * from a subsequent sale or exchange of the property". (Emphasis added.) While subdivision (ii) specifies that the donee's vested property right must have a value proportional to the value of the encumbered property, it does not otherwise describe the property in which the donee must have a vested right. Nevertheless, considering the "property right" language in subdivision (ii) together with the term "donee's proceeds" in subdivision (i), we think it the intent of the drafters of section 1.170A–14(g)(6), Income Tax Regs., that the donee have a right to a share of the proceeds and not merely a contractual claim against the owner of the previously servient estate.

Petitioners having in effect conceded that NAT enjoyed no such right to proceeds under the agreement or the lender agreement, we conclude that, notwithstanding that section IV.C. of the agreement tracks the language of subdivision (ii), the agreement, as qualified by the lender agreement, fails to satisfy the requirements of section 1.170A–14(g)(6), Income Tax Regs.

b. *Subordination*

On brief, petitioners head one of their arguments: "The Facade Easement Contribution Satisfies The Requirements of Treas. Reg. § 1.170A–14(g)(2)". They appear to believe that respondent is arguing that the agreement fails to establish a perpetual conservation restriction "because * * * [the bank] did not subordinate its rights to * * * [NAT's] right to

receive a proportionate share of condemnation or insurance proceeds, and therefore the * * * [agreement] somehow fails to comply with Treas. Reg. § 1.170A–14(g)(6)." Put another way, they appear to believe that respondent has conflated the subordination requirement found in section 1.170A–14(g)(2), Income Tax Regs., with the extinguishment provision found in section 1.170A–14(g)(6), Income Tax Regs., so that, in order for a donor to show that its donation satisfies the extinguishment provision, any mortgagee must "subordinate its interests so that a donee organization has a priority interest in insurance or condemnation proceeds." Respondent disavows making that argument, stating that neither his motion for summary judgment nor our Opinion, *Kaufman v. Commissioner*, 134 T.C. 182 (2010), even references section 1.170A–14(g)(2), Income Tax Regs. He believes that he argued, and we decided, that the facade easement contribution failed to satisfy the extinguishment provision without regard to whether the bank had subordinated its rights in the property to NAT's rights therein, so as to satisfy the subordination requirement. He is correct.

Satisfying the subordination requirement immunizes against the effect of the general rule, described *supra* section I.B. of this report, that an easement is lost by the foreclosure of a mortgage or trust deed burdening the servient tenement, when such mortgage or trust deed was executed prior to the creation of the easement. Annotation, "Foreclosure of mortgage or trust deed as affecting easement claimed in, over, or under property", 46 A.L.R. 2d 1197 (1956 & Supp.); see also, e.g., *Camp Clearwater, Inc. v. Plock*, 146 A.2d 527, 536–537 (N.J. Super. Ct. Ch. Div. 1958) ("The foreclosure of a mortgage vests in the purchaser at the foreclosure sale a legal right to the property free of easements and encumbrances imposed upon it subsequent to the mortgage *provided that* the holders of such easement rights or encumbrances are made parties to the foreclosure."), affd. 157 A.2d 15 (N.J. Super. Ct. App. Div. 1959).

We did not base our grant of partial summary judgment for respondent on any consideration of the consequences of foreclosure of the bank's mortgage. We based our grant solely on the fact, conceded by petitioners, that, because, following a judicial extinguishment of the facade easement, NAT might not receive its proportionate share of any future proceeds, the

agreement failed to satisfy the requirements of section 1.170A–14(g)(6), Income Tax Regs., and so failed to satisfy the enforceability-in-perpetuity requirements under section 1.170A–14(g), Income Tax Regs., and section 170(h)(2)(C) and (5)(A). We think it unnecessary to our result, and reach no conclusion, as to whether the bank subordinated its rights in the property to the right of NAT to enforce the facade easement so as to satisfy the requirements of section 1.170A–14(g)(2), Income Tax Regs.

c. *Section 1.170A–14(g)(3), Income Tax Regs.*

Referring to the so-remote-as-to-be-negligible standard found in section 1.170A–14(g)(3), Income Tax Regs., petitioners argue that, in determining whether the enforceability-in-perpetuity requirement embodied in section 1.170A–14(g), Income Tax Regs., is met, "a court must consider * * * the remoteness of any future event that is alleged to defeat the interest passing to charity." They then hypothesize "a very low probability of occurrence" for a set of events [8] that would deprive NAT of its proportional share of the proceeds (determined under section 1.170A–14(g)(6)(ii), Income Tax Regs.) following judicial extinguishment of the facade easement and a subsequent sale of the property. They conclude that the possibility of such deprivation is "so remote as to be negligible" and, thus, to be disregarded under the so-remote-as-to-be-negligible standard in determining whether the facade easement is enforceable in perpetuity.

As stated, respondent argues that the so-remote-as-to-be-negligible standard is irrelevant to the extinguishment provision. Respondent believes the extinguishment provision establishes "a strict, standalone requirement enacted to ensure that the conservation purposes of an extinguished easement be carried out by the donee as nearly as possible." He considers the extinguishment provision to establish a rule "similar to the rule of *cy pres*". He also argues: "It assumes an event, extinguishment of the easement, that is virtually by definition, remote. Therefore, it would be illogical to read

---

[8] "Condemnation of the property, judicial extinguishment of the easement, existence of the subordination agreement at that time, insufficiency of the condemnation proceeds to cover the bank's prior claim to proceeds, and judgment-proof status of the property owner". Attaching a 10-percent probability to the occurrence of each of those events, they calculate a joint probability of 0.001 percent.

\* \* \* [the so-remote-as-to-be-negligible standard] into \* \* \* [the extinguishment provision]."

We described *supra* section I.B. of this report some of the means by which conservation restrictions may be modified or terminated, and we voiced our belief *supra* section I.D.1. of this report that the drafters of section 1.170A–14(g), Income Tax Regs., sought to mitigate or otherwise address the threat to the enforceability-in-perpetuity requirement presented by some of those possibilities. Satisfying the so-remote-as-to-be-negligible standard immunizes against the risk that acts or events of such low probability will defeat the donee's interest in the servient property. Section 1.170A–14(g)(3), Income Tax Regs., is silent with respect to the right of the donee to any recompense on account of the actual occurrence of the risk, and it appears that the drafters' intent was simply to foreclose any argument that a charitable contribution deduction is unavailable because the donee's interest could be defeated by remote, improbable events. That point is nicely illustrated by *Stotler v. Commissioner*, T.C. Memo. 1987–275, a case petitioners cite for the proposition that the enforceability-in-perpetuity requirement is per se satisfied if the possibility of a defeasing event is so remote as to be negligible.[9] The case stands for no such thing, addressing neither section 1.170A–14(g), Income Tax Regs., in general, nor paragraph (g)(6) thereof in particular, since the contribution in the case occurred before the effective date of that regulation. To determine whether the contribution in that case satisfied the enforceability-in-perpetuity requirement as it existed before promulgation of section 1.170A–14(g), Income Tax Regs., we had to determine whether the possibility of condemnation of the servient property was so remote as to be negligible, as required by section 1.170A–1(e), Income Tax Regs. We found in the affirmative, notwithstanding that, if the particular property in question were condemned, the underlying easement would terminate, and the donor would be entitled to all of any condemnation proceeds, as if the property had not been burdened by the easement.

---

[9] *Satullo v. Commissioner*, T.C. Memo. 1993–614, affd. without published opinion 67 F.3d 314 (11th Cir. 1995), applying sec. 1.170A–14(g), Income Tax Regs., might be taken as support for the proposition, but petitioners do not cite the case for that point, and our discussion of the point was speculative, since the taxpayers in the case did not set forth facts showing that the possibility of foreclosure of the easement was so remote as to be negligible.

It perhaps belabors the obvious to point out that the risk addressed by the extinguishment provision—an "unexpected" change in conditions surrounding the property—likely describes a class of events the range of whose probabilities includes, if it is not coincident with, the range of probabilities of events that are so remote as to be negligible. One does not satisfy the extinguishment provision, however, merely by establishing that the possibility of a change in conditions triggering judicial extinguishment is unexpected, for, unlike the risk addressed by the so-remote-as-to-be-negligible standard, to satisfy the extinguishment provision, section 1.170A–14(g)(6), Income Tax Regs., provides that the donee must ab initio have an absolute right to compensation from the postextinguishment proceeds for the restrictions judicially extinguished. It is Lorna Kaufman's failure to accord NAT an absolute right to a fixed share of the postextinguishment proceeds that causes her gift to fail the extinguishment provision. It is not a question as to the degree of improbability of the changed conditions that would justify judicial extinguishment of the restrictions. Nor is it a question of the probability that, in the case of judicial extinguishment following an unexpected change in conditions, the proceeds of a condemnation or other sale would be adequate to pay both the bank and NAT. As we said in *Kaufman v. Commissioner*, 134 T.C. at 186, the requirement in section 1.170A–14(g)(6)(ii), Income Tax Regs., that NAT be entitled to its proportionate share of the proceeds is not conditional: "Petitioners cannot avoid the strict requirement in section 1.170A–14(g)(6)(ii), Income Tax Regs., simply by showing that they would most likely be able to satisfy both their mortgage and their obligation to NAT."

E. *Conclusion*

Petitioners have failed to persuade us that we erred in *Kaufman v. Commissioner*, 134 T.C. 182 (2010), in concluding that the contribution of the facade easement failed as a matter of law to comply with the enforceability-in-perpetuity requirements under section 1.170A–14(g)(6), Income Tax Regs. We therefore affirm our grant of partial summary judgment to respondent on the grounds set forth in *Kaufman*. We shall deny petitioners' motion for reconsideration.

II. *Cash Contribution*

A. *Introduction*

In determining the deficiency for 2003, respondent disallowed a charitable contribution deduction of $16,870 petitioners claimed for a cash contribution to NAT. Respondent explained that he disallowed the deduction "because it was made subject to or in contemplation of subsequent event(s)." In determining the deficiency for 2004, respondent did not disallow any charitable contribution deduction on account of a cash contribution to NAT. Lorna Kaufman paid $3,332 to NAT in 2004. The parties have both amended their pleadings relating to Lorna Kaufman's payments to NAT.

In May 2010, before trial, petitioners amended their petition in the belief that respondent's disallowance of the cash contribution deduction for 2003 was based on the ground that Lorna Kaufman's obligation to make the contribution was conditional on her receipt of a qualified appraisal (the conditional-payment ground). Petitioners added the following to their prayer for relief: "[I]f petitioners [sic] cash contributions to the Donee were made subject to a condition, petitioners are entitled to [a] deduction of $16,840 in the 2004 tax year."

In June 2010, after trial, we allowed respondent to amend the answer to, among other things, assert both an increased deficiency and an accuracy-related penalty for 2004. He justified that amendment on the ground that he had only recently become aware that Lorna Kaufman paid $3,332 to NAT in 2004 and that petitioners claimed a charitable contribution deduction therefor on their 2004 return. By the amendment to answer, he first argued that $300 of the $3,332 Lorna Kaufman paid to NAT in 2004 is not deductible because it reimbursed NAT for a fee it paid to the bank on her behalf. Petitioners apparently concede that the $300 payment is not deductible, a concession we accept, and we shall not further discuss that payment.

As to both the remaining $3,032 Lorna Kaufman paid to NAT in 2004 and the $16,840 she had paid it in 2003, respondent by the amendment to answer sets forth two grounds for disallowing any charitable contribution deduction. First, those sums were paid in exchange for substantial

services provided by NAT to petitioners "to facilitate petitioners' deduction of a large, unjustified noncash contribution of a facade easement that both petitioners and NAT knew had no value" (the quid pro quo ground). Second, the total of the payments, $19,872, "was based on the value of the facade easement and/or the value of the [resulting] tax deduction" petitioners claimed, either, or both, of which could turn out to be zero (i.e., the conditional-payment ground). With respect only to the $3,032 paid to NAT in 2004, respondent adds a third ground: "Petitioners relied on a contemporaneous written acknowledgment that they knew was inaccurate in claiming the erroneous charitable deduction of $3,032."

Respondent bears the burden of proof with respect to the increased deficiency and penalty for 2004 resulting from his disallowance of a deduction for the $3,032 paid by Lorna Kaufman to NAT in 2004. See Rule 142(a)(1). He also bears the burden of proof with respect to the quid-pro-quo ground for disallowing petitioners a deduction for Lorna Kaufman's payment of $16,840 to NAT in 2003 (and now, because of the amended petition, claimed, alternatively, to be deductible for either 2003 or 2004). He bears that burden because the quid-pro-quo ground constitutes new matter, requiring petitioners to present different evidence from that necessary to rebut his original ground (the conditional-payment ground) for disallowing the deduction in 2003. See *id.*; *Shea v. Commissioner*, 112 T.C. 183, 191 (1999).

B. *Discussion*

1. *Conditional Payment*

Respondent's original explanation of the conditional-payment ground, supplemented by an argument in the amended petition, is that the $16,840 Lorna Kaufman paid to NAT in 2003 and the $3,032 she paid to it in 2004 (in total, $19,872) were conditional payments (subject to refund) if *either* the appraisal reported the value of the facade easement to be zero *or* we disallow petitioners' charitable contribution deduction for the contribution of the facade easement to NAT. Petitioners answer respondent's first alternative as follows: "While there may be an argument that the * * * [$16,840] cash donation * * * made in 2003, became 'final' and deduct-

ible in 2004, this does not support a complete disallowance, but simply moves the deduction into 2004." Petitioners answer respondent's second alternative: "The * * * witnesses [from NAT] and Petitioners were in uniform agreement that * * * [it] was not their understanding" that "Petitioners might be entitled to a refund of the cash donation should their tax deduction for the facade easement contribution be disallowed."

Neither party disputes that the amount of the cash payment contemplated from Lorna Kaufman was a function of the appraised value of the facade easement, which was not determined until 2004. Respondent argues that, at the end of 2003, it was possible that the appraisal would show the facade easement to be valueless, thus entitling Lorna Kaufman to a refund of the $16,840 she paid in that year. Respondent further argues that possibility was not so remote as to be negligible, thereby depriving petitioners of a 2003 deduction for the cash payment. See sec. 1.170A–1(e), Income Tax Regs. As stated, petitioners concede there "may be" an argument that the $16,840 payment became final and, if deductible, is deductible for 2004. We assume that petitioners' concession is based on their receiving the appraisal in 2004 and their conclusion that, before receipt of the appraisal in 2004, there was the possibility that NAT would refund some or all of the $16,840 Lorna Kaufman had paid it in 2003. Petitioners bear the burden of proving that, at the end of 2003, the possibility of a zero appraisal value was not so remote as to be negligible. They have not carried that burden. Indeed, there is in evidence an email from Mr. Bahar (NAT's area manager) to Gordon Kaufman, dated February 6, 2004, assuring him that properties in a historic neighborhood (like the property) "are not at a market value disadvantage when compared to the other properties in the same neighborhood." We sustain respondent's disallowance of a deduction for $16,840 paid by Lorna Kaufman to NAT in 2003.

Respondent's alternative argument that the cash payments were conditional because refundable if we disallow any deduction for the facade easement contribution is based on the clause in the application that the "cash endowment contribution is set at 10% of the *value of the donation tax deduction*". (Emphasis added.) We found credible the testimony of both NAT's representatives and petitioners that that was not

the intent of the clause. We also found credible Gordon Kaufman's testimony that petitioners did not expect to receive any money back. We find that the cash contributions were not conditional on the success of petitioners' charitable contribution deductions for the contribution of the facade easement to NAT.

After she received the appraisal in January 2004, Lorna Kaufman had no right to a refund of $19,872 of cash payments made to NAT.

### 2. *Quid Pro Quo*

#### a. *Introduction*

Respondent questions Lorna Kaufman's charitable intent. He argues: "[T]he record shows that petitioners made the cash payments because they knew they had to in order for NAT to accept the donation of the facade easement and to sign their Form 8283, which allowed them to take a deduction worth over $75,000." Additionally, he argues:

  NAT provided substantial services to petitioners in exchange for these cash payments. NAT accepted and processed the preservation restriction agreement application, provided a form preservation restriction agreement that it had developed and negotiated with Massachusetts Historical Commission, dealt with the local and federal authorities in obtaining the necessary approvals, and dealt with Lorna Kaufman's mortgage holder, Washington Mutual, procuring Washington Mutual's execution of the "Lender Agreement." * * * [NAT's representative] even gave * * * [Gordon] Kaufman tax advice.
  Most importantly, NAT gave * * * [Gordon] Kaufman the names of NAT-approved appraisers * * *. * * * *

In his reply brief, respondent mitigates his first argument: "Respondent * * * agrees with the general proposition that the expected receipt of a tax deduction is not a benefit that invalidates the deduction." Nevertheless, he continues to argue that petitioners are entitled to no deduction for the cash payments because Lorna Kaufman was "*required*" to make them.

#### b. *Required Cash Donation*

Petitioners answer respondent's first argument (a cash donation was required) as follows: "[NAT] solicits cash donations to enable it to pay its operating expenses, and to build

its stewardship fund so that it can monitor eased properties and enforce its rights under facade conservation easements in perpetuity." They add that, "[a]part from donors' cash contributions, * * * [NAT] had no meaningful source of [operating] funds". They deny that NAT's acceptance of the facade easement and its issuance to petitioners of a Form 8283 were conditioned on its receipt of a cash contribution. They claim that many donee organizations benefiting from preservation restrictions require accompanying cash contributions. They point to the parties' stipulation[10] that the National Park Service currently advises visitors to its Web site:[11]

Many easement holding organizations require the easement donor to make an additional donation of funds to help administer the easement. These funds are often held in an endowment that generates an annual income to pay for easement administration costs such as staff time and travel expenses, or needed legal services.

Of course, we agree with respondent: "Only unrequited payments to qualified recipients are deductible. *Hernandez v. Commissioner*, 490 U.S. 680, 690 (1989)." Neither party, however, has provided us with any authority governing the deductibility of a payment to a charitable organization when the organization's acceptance of a contribution of property is conditioned on the donor's cash donation sufficient to maintain the property and contribute to operating costs.[12] The practice may be common, and no doubt provides funds to serve the charitable purposes of the donee. In the situation described by the National Park Service, it is difficult to see how the cash donation benefits the donor other than in making possible the contribution of the associated property

---

[10] Respondent objects to the stipulation as irrelevant; we disagree and overrule the objection.

[11] http://www.nps.gov/hps/tps/tax/download/easements—2010.pdf (last visited, Feb. 2, 2011), at which can be found a pamphlet, "Easements to Protect Historic Properties: A Useful Historic Preservation Tool with Potential Tax Benefits". Language similar to the quoted language is at 8.

[12] In *McMillan v. Commissioner*, 31 T.C. 1143 (1959), we disallowed a charitable contribution deduction for $75 paid by adoptive parents to a charitable organization operating an adoption program as a prerequisite to placing a child in their home preliminary to an adoption. The payment was regarded by the organization as a fee for service to cover part of the cost of operating an adoption program. We concluded that whatever charitable aspects there may have been to the payment lose significance when compared to the personal benefits that would result to the taxpayers from the completed adoption. *McMillan* is distinguishable because, as discussed in the text, the personal benefits Lorna Kaufman received were the accomplishment of the contribution and entitlement to charitable contribution deductions on account of both the facade easement and cash contributions.

and giving rise to an added charitable contribution deduction (an acceptable benefit).

While the parties have wrestled over the value of the facade easement, given our disposition of the facade easement contribution issue on legal grounds, that is not a question of fact we must decide. Moreover, respondent does not claim that the cash payments were in consideration for NAT's facilitation of a sham transfer. Seeing no benefit to Lorna Kaufman other than facilitation of her contribution of the facade easement (which we discuss in the next paragraph) and an increased charitable contribution deduction, we shall not deny petitioners' deduction of the cash payments on the ground that the application required a "donor endowment" to accompany the contribution of facade easement.

c. *Fee for Services*

As to respondent's second argument (a fee for services), petitioners principally respond that NAT's actions were taken primarily to benefit it, and any benefit to petitioners was ancillary. Recently, in *Scheidelman v. Commissioner*, T.C. Memo. 2010–151, we addressed a similar claim by the Commissioner that a cash payment made to NAT ancillary to a facade easement contribution to it was a quid pro quo for NAT's assistance in obtaining a tax deduction. We stated the familiar rule: "A payment of money or transfer of property generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return." *Id.* (citing *United States v. Am. Bar Endowment*, 477 U.S. 105, 116 (1986)). We elaborated:

"If a transaction is structured in the form of a quid pro quo, where it is understood that the taxpayer's money will not pass to the charitable organization unless the taxpayer receives a specific benefit in return, and where the taxpayer cannot receive the benefit unless he pays the required price, then the transaction does not qualify for the deduction under section 170."

*Id.* (quoting *Graham v. Commissioner*, 822 F.2d 844, 849 (9th Cir. 1987), affd. sub nom. *Hernandez v. Commissioner*, 490 U.S. 680 (1989)). The burden was on the taxpayers in *Scheidelman* to prove that they made no quid pro quo payment to NAT for something of substantial value or, if they did, that their payment exceeded the value of what they

received. Because they failed to provide evidence necessary to carry their burden, we denied them any deduction for their cash payment to NAT. *Id.*

The shoe is on the other foot here, since, as discussed *supra* section II.A. of this report, respondent's quid-pro-quo ground constitutes new matter, requiring different evidence, for which respondent bears the burden of proof pursuant to Rule 142(a)(1). For respondent to succeed with his fee-for-services argument, the evidence must show a quid pro quo; i.e., that, reciprocally, Lorna Kaufman made a payment and NAT provided services of substantial value. Respondent argues that the evidence shows that Lorna Kaufman's payments reciprocated NAT's accepting and processing her application, providing her with a form preservation restriction agreement, undertaking to obtain approvals from the necessary government authorities, securing the lender agreement from the bank, giving Gordon Kaufman basic tax advice, and providing him with a list of approved appraisers. The evidence, however, is ambiguous as to whether Lorna Kaufman's payments reciprocated NAT's undertakings. We do have in evidence NAT's October 13, 2003, introductory letter to Lorna Kaufman, representing that her contribution to NAT would require very little effort by her because NAT would handle all of the red tape and paperwork. We also have in evidence Mr. Kearns' (NAT's president's) December 16, 2003, letter to her, asking her to sign the agreement and send NAT a check for $15,840. By that date, however, NAT had undertaken and completed many of the tasks of concern to respondent although it had received only a $1,000 deposit from her. Moreover, Mr. Kearns also states in that letter that, if, by February 28, 2004, the bank did not subordinate, she failed to receive historic certification of the property, or an appraisal could not be obtained, NAT would join with her in voiding the agreement, reimburse her costs, and refund her cash contribution. Certainly, NAT was accommodating to Lorna Kaufman, but it was in its interest as much as hers to complete the contribution of the facade easement. We assume moreover that NAT undertook the delineated tasks in anticipation of a cash contribution if a facade contribution were made but cognizant of the risk that a facade contribution might not be made (or might be unwound if the delineated conditions were not satisfied). The evidence does not

convince us that Lorna Kaufman's payments reciprocated NAT's undertakings. Finally, we assume that respondent's position is that NAT's undertakings were of monetary value to Lorna Kaufman (saving her time and expense), yet the record is devoid of evidence of the value (much less the *substantial* value) of those undertakings. Respondent has failed to make the necessary showing of a quid pro quo. We shall not disallow petitioners a deduction for the cash payments as a fee-for-services quid pro quo, as argued by respondent.

3. *Failure To Substantiate*

Section 170(f)(8)(A) provides that a taxpayer may not deduct any contribution of $250 or more unless she substantiates the contribution with a contemporaneous written acknowledgment of the contribution by the donee organization that meets the requirements of section 170(f)(8)(B). The donee's written acknowledgment must state the amount of cash and describe other property contributed, indicate whether the donee organization provided any goods or services in consideration for the contribution, and provide a description and good faith estimate of the value of any goods or services provided by the donee organization. Sec. 170(f)(8)(B).

In *Addis v. Commissioner*, 118 T.C. 528, 537 (2002) (citing sections 1.170A–1(h)(4)(ii) and 1.170A–13(f)(7), Income Tax Regs.), affd. 374 F.3d 881 (9th Cir. 2004), we stated:

Section 170(f)(8) disallows a charitable contribution deduction in circumstances such as these, where the donee organization's contemporaneous written acknowledgment is erroneous and is not a good faith estimate of the value of goods or services it provided, and where the taxpayer unquestioningly and self-servingly uses that erroneous statement to claim a charitable contribution larger than the one to which he or she would be entitled under section 170. * * *

NAT sent Lorna Kaufman letters acknowledging her contributions of both the facade easement and the cash payments. In those letters it certified that she had received no goods or services in return for her gifts. Respondent catalogs most of the items we described *supra* section II.B.2. of this report (e.g., NAT negotiated with government agencies to obtain the necessary approvals). He then claims that peti-

tioners should be denied a charitable contribution deduction for Lorna Kaufman's cash payments to NAT because (1) NAT's acknowledgment letters "were erroneous and did not contain a good faith estimate of the value of the goods or services NAT provided" and (2) "petitioners 'unquestioningly and self-servingly' relied on these letters, which they knew to be inaccurate, to claim deductions for the cash payments".

Respondent's argument here is limited by his pleading to the $3,032 payment Lorna Kaufman made to NAT in 2004. It also suffers from respondent's failure to prove the monetary value, if any, of what Lorna Kaufman may have received from NAT. Moreover, respondent has failed to prove that Lorna Kaufman knew the items had value (if, indeed, they did) and, therefore, knew that the letters were inaccurate (if, indeed, they were). We shall not disallow a deduction for the 2004 $3,032 cash payment on the ground of a failure to substantiate.

### C. *Conclusion*

Petitioners are entitled to a charitable contribution deduction for 2004 of $19,872 for cash payments Lorna Kaufman made to NAT in 2003 and 2004.

## III. *Penalty*

### A. *Introduction*

Section 6662 imposes an accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to, among other things, negligence or disregard of rules or regulations (without distinction, negligence), a substantial understatement of income tax, or a substantial valuation misstatement. Sec. 6662(a) and (b)(1), (2), and (3). The penalty is 20 percent of the portion of the underpayment of tax to which the section applies. Sec. 6662(a). In the case of a gross valuation misstatement, 20 percent is increased to 40 percent. Sec. 6662(h)(1).

Section 6664(c) provides a reasonable cause exception to the accuracy-related penalty. Generally, under section 6664(c)(1), no penalty is imposed under section 6662 with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. The

reasonable cause exception does not apply, however, in the case of a substantial or gross valuation overstatement with respect to property for which a charitable contribution deduction was claimed under section 170 unless the claimed value of the property was based on a "qualified appraisal" by a "qualified appraiser" and the taxpayer made a good faith investigation of the value of the contributed property. Sec. 6664(c)(2) and (3).

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is proper to impose penalties. *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause. *Id.* at 446–447.

Initially, respondent determined that, on account of his disallowance of their deduction for the contribution of the facade easement to NAT, petitioners underpaid the tax required to be shown on their 2003 return and were liable for the accuracy-related penalty on the grounds of either negligence, a substantial understatement of income tax, a substantial valuation misstatement, or a gross valuation misstatement. On brief, however, respondent concedes that, if we do not reach the issue of valuation of the facade easement contribution because we sustain our grant of summary judgment for respondent (so that the deduction is denied as a matter of law), no accuracy-related penalty on the grounds of either a substantial or gross valuation misstatement will apply. Respondent adds: "However, the 20% negligence and substantial understatement of tax penalties will still be applicable, although not imposed cumulatively." [13]

B. *Negligence Penalty*

Petitioners argue, and respondent agrees, that, because it presents an issue of first impression, no negligence penalty is warranted on account of our disallowing petitioners a deduction for the contribution of the facade easement if the

---

[13] Apparently on the basis of his abandonment of valuation misstatement as grounds for an accuracy-related penalty if we sustain our order granting him partial summary judgment (which we do), respondent makes no argument that petitioners are precluded by sec. 6664(c)(2) from arguing for application of the sec. 6664(c)(1) reasonable cause exception.

disallowance is on the ground that the contribution failed as a matter of law to comply with the enforceability-in-perpetuity requirements under section 1.170A–14(g)(6), Income Tax Regs. See, e.g., *Rolfs v. Commissioner*, 135 T.C. 471, 496 (2010) (considering, among other things, "uncertain state of the law" in sustaining section 6664(c)(1) "reasonable cause" and "good faith" defense).

Nevertheless, respondent argues for petitioners' negligence in claiming a deduction for the contribution of the facade easement on the basis of respondent's claim that petitioners "knew * * * that * * * [the contribution of the facade easement] would not diminish the value of their property." What petitioners knew is a factual question hotly contested by the parties. The question involves not only the subjective issue of their states of mind but the objective issue of how much, if any, conveyance of the facade easement reduced the value of the property, an issue the parties address with expert testimony. "Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials." *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). It may be granted only if there is no genuine issue as to any material fact. See Rule 121(b). We granted respondent partial summary judgment, disallowing petitioners' deductions for Lorna Kaufman's contribution of the facade easement to NAT, on the basis that the contribution failed as a matter of law to comply with the enforceability-in-perpetuity requirements under section 1.170A–14(g)(6), Income Tax Regs. We had no need to consider the value of the facade easement and think it consistent with the underlying premises for summary adjudication that we not now be required to invest the time and effort necessary to resolve the difficult factual questions of intent and value presented by respondent's claim of negligence. See, e.g., *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010–283 (illustrating the laborious undertaking that determining the value of a conservation restriction may present to the trier of fact).

Moreover, whatever argument respondent might make that we should now, in the penalty phase of the case, focus on value as a basis for negligence is negated by his abandonment of value as a basis for imposition of the accuracy-related penalty on account of a valuation misstatement with respect to the facade easement.

We shall, for the reasons stated, reject respondent's argument that petitioners negligently overstated the charitable contribution deductions they claimed on account of the facade easement contribution. Because respondent has made no other argument for petitioners' negligence in connection with those deductions, we find that, in connection with those deductions, they were not negligent.

With respect to our disallowance of a deduction for the 2003 cash contribution, petitioners virtually concede that a 2003 deduction was in error. Petitioners were negligent in claiming that deduction and have not established reasonable cause and good faith as a defense. We sustain an accuracy-related penalty with respect to the resultant underpayment.

## C. *Substantial Understatement of Income Tax*

Section 6662(d)(1)(A) defines "substantial understatement of income tax" as an amount exceeding the greater of 10 percent of the tax required to be shown on the return or $5,000.

Respondent asserts that substantial understatements of income tax exist for 2003 and 2004. Each of the understatements of income tax, after disallowance of the charitable contribution deductions attributable to the easements, is greater than $5,000 and greater than 10 percent of the amount of tax required to be shown on the return. Respondent has met his burden of production for 2003 and 2004.

In opposition to respondent's claims of underpayments of tax due to section 6662(b)(2) substantial understatements of income tax, petitioners raise a section 6664(c)(1) reasonable cause and good faith defense. Respondent answers in part:

[F]or the same reasons petitioners are liable for the negligence prong of the penalty under I.R.C. § 6662(b)(2), they cannot escape the penalty under the reasonable cause exception: They * * * [knew] that the easement likely had no value and yet nonetheless claimed a charitable deduction for it. They did not act in good faith.

Consistent with our refusal *supra* section III.B. of this report to consider misvaluation as a basis for negligence, we refuse to consider it a reason for the underpayment in income tax that respondent has shown. We granted respondent partial summary judgment because, and only because, Lorna Kaufman's contribution of the facade easement to NAT failed as a matter of law to comply with the

enforceability-in-perpetuity requirements under section 1.170A–14(g)(6), Income Tax Regs. We think it consistent with the underlying premises for summary adjudication that we consider only that ground as giving rise to petitioners' underpayments of tax for 2003 and 2004. [14]

As respondent concedes, see *supra* section III.B. of this report, that ground presents an issue of first impression. Consistent with our analysis in *Rolfs v. Commissioner*, *supra* at 495–496, we find that there was reasonable cause for the portions of petitioners' 2003 and 2004 underpayments due to that ground and that they acted in good faith with respect to those portions.

### D. *Conclusion*

We sustain an accuracy-related penalty only on the basis of petitioners' negligence with respect to the underpayment of their 2003 tax that is attributable to Lorna Kaufman's cash payments to NAT in 2003.

### IV. *Conclusion*

We shall issue an order denying petitioners' motion for reconsideration of our grant of partial summary judgment. Otherwise,

> *An appropriate order will be issued, and decision will be entered under Rule 155.*

---

[14] Putting aside the disallowance of the cash contribution for 2003, which we dealt with *supra* sec. III.B. of this report.