# United States Court of Appeals
## For the First Circuit

Nos. 11-2017, 11-2022

GORDON KAUFMAN; LORNA KAUFMAN,

Petitioners, Appellants/Cross-Appellees,

v.

DOUGLAS SHULMAN, COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee/Cross-Appellant.

APPEALS FROM THE UNITED STATES TAX COURT

Before

Lynch, <u>Chief Judge</u>,
Boudin and Lipez, <u>Circuit Judges</u>.

<u>Catherine M.A. Carroll</u> with whom <u>Seth P. Waxman</u>, <u>Thomas R. Dettore</u> and <u>Wilmer Cutler Pickering Hale and Dorr LLP</u> were on brief for petitioners, appellants/cross-appellees.
<u>Rebecca K. Troth</u>, <u>David R. Hill</u>, <u>Ryan C. Morris</u>, <u>Sidley Austin LLP</u>, <u>Paul W. Edmondson</u>, <u>Elizabeth S. Merritt</u> and <u>Ross M. Bradford</u>, National Trust for Historic Preservation, on brief for the National Trust for Historic Preservation, Amicus Curiae.
<u>Patrick J. Urda</u>, Tax Division, Department of Justice, with whom <u>Tamara W. Ashford</u>, Deputy Assistant Attorney General, and <u>Kenneth L. Greene</u>, Tax Division, Department of Justice, were on brief for respondent, appellee/cross-appellant.

July 19, 2012

**BOUDIN, Circuit Judge.** This case comprises appeals by both sides--the Commissioner of Internal Revenue ("the IRS") and the taxpayers Gordon and Lorna Kaufman--from a decision of the Tax Court. The subject is deductions on the couple's joint returns of the asserted value of Lorna Kaufman's donation to the National Architectural Trust of a façade easement restricting alterations on her Boston house. A brief description of the background events and proceedings follows, which is elaborated where necessary later in this decision.

In 1999, Lorna Kaufman bought for $1,050,000 a row house in the South End of Boston, an area (not to be confused with South Boston), which is subject to local restrictions aimed at historic preservation.[1] The row house, 19 Rutland Square, was designed by physician Elbridge Dudley and built between 1859 and 1861; it reflected popular mid-nineteenth-century architectural trends but also featured a Venetian Gothic-style façade that distinguished it from redbrick row houses elsewhere in the South End.

---

[1] The South End Landmark District is one of nine neighborhoods designated as a historic district by the Boston Landmarks Commission pursuant to state law. See Eckstein v. Bos. Landmarks Comm'n, 17 L.C.R. 401, 401, 2009 Mass. LCR LEXIS 75, at *2-3 (Mass. Land Ct. June 26, 2009). Exterior alterations to buildings in the South End neighborhood must be approved by a local district commission. See S. End Landmark Dist., Standards and Criteria 1 (rev. Apr. 27, 1999); Landmarks Frequently Asked Questions, City of Boston, http://www.cityofboston.gov/landmarks/FAQ (last visited June 25, 2012).

The Kaufmans renovated the house, which included the restoration of original details of the façade.  In 2003, the couple learned about a tax incentive program for historic preservation, promoted in this instance by an organization then known as the National Architectural Trust, since renamed the Trust for Architectural Easements.  A Trust representative advised the Kaufmans that the Trust could help the couple qualify for a tax deduction equal to 10 to 15 percent of the fair market value of their home and that the Trust "as part of our service . . . will be handling all the red tape and paperwork."

A provision of the Internal Revenue Code, 26 U.S.C. § 170(h) (2006), creates an incentive for taxpayers to donate real property interests to nonprofit organizations and government entities for "conservation purposes."  Adopted in 1976 and amended the following year, the statute allows taxpayers to claim a deduction for donating a real property interest--including an easement--"exclusively for conservation purposes."  Tax Reform Act of 1976, Pub. L. No. 94-455, § 2124(e)(1)(C), 90 Stat. 1520, 1919 (1976); see also Tax Reduction and Simplification Act of 1977, Pub. L. No. 95-30, § 309(a), 91 Stat. 126, 154 (amending statute); 26 U.S.C. § 170(h)(1)-(2) (current codification).  These purposes include the preservation of "historically important" land areas or structures.  Pub. L. No. 94-455, § 2124(e)(1)(D), 90 Stat. at 1919; see also 26 U.S.C. § 170(h)(4)(A)(iv) (current codification).  Cf.

-3-

26 U.S.C. § 170(f)(3)(B)(iii) (exempting "qualified conservation contributions" from general denial of deduction for donations of partial interests in property).

The deduction for granting the easement is intended to reflect the value of what the taxpayer has donated which, in the absence of a "market" for such easements, can be measured by "the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction." 26 C.F.R. § 1.170A-14(h)(3)(I) (2004). A central condition of the deduction, reflecting a change made in the 1977 amendment to the statute, is that the lease, option or easement be granted "in perpetuity." Pub. L. No. 95-30, § 309(a), 91 Stat. at 154 (codified as amended at 26 U.S.C. § 170(h)(2)(C)).

On or about October 31, 2003, Lorna Kaufman submitted an application on the Trust's own form and made a $1,000 "good faith deposit"; she further agreed, as specified by the Trust, to make a "cash endowment contribution" to the Trust equal to 10 percent of the value of the ultimate deduction for the easement. This is at least one means by which the Trust finances its work. The deposit was to be returned if the "the necessary approvals cannot be obtained" and the cash endowment contribution reduced in part if the easement donation could not be processed in time to qualify for a 2003 deduction.

The Trust advised Lorna Kaufman that if her property was under mortgage, she needed to obtain consent from the mortgagee to subordinate its interest in the property to the easement. Accordingly, the Kaufmans sent a letter to their mortgage lender, Washington Mutual Bank, asking it to subordinate its rights to the easement being granted to the Trust. The letter stated that restrictions on the property imposed by the easement were "essentially the same restrictions as those imposed by current local ordinances that govern this property." If this were so, the bank would lose little or nothing by consenting.

On December 22, 2003, Lorna Kaufman executed a Preservation Restriction Agreement supplied by the Trust and, a few days later, sent it back to the Trust together with a further contribution that the Trust had solicited in the amount of $15,840 (over and above her earlier $1,000 good-faith deposit). This further contribution, the Trust said, could be adjusted dependent on the appraised value of the easement.[2]

The Trust also offered the names of two recommended appraisers, and the Kaufmans selected one of the two, Timothy Hanlon, a certified appraiser who for the previous nineteen years

---

[2] The Kaufmans' cash transfers to the Trust of $16,840 in 2003 and $3,032 in 2004 total 9 percent of the $220,800 value set by the appraiser. Although the Trust normally asks for a cash endowment equal to 10 percent of the value of the easement, the Trust applied a 1 percentage point reduction due to the delay in obtaining the requisite approvals.

had managed his own residential appraisal company. Hanlon inspected the 19 Rutland Square property in January 2004 and submitted his report on January 30, estimating that the fair market value of the donated easement was $220,800. Gordon Kaufman expressed concern that the reduction in the value of the property due to the easement might be "so large as to overwhelm the tax savings that accrue from it," but a representative of the Trust sought to reassure him that it was "very unlikely" that the easement would affect the marketability of the property.

Meanwhile, the Kaufmans successfully secured consent from their lender, Washington Mutual, to an agreement "subordinating [the bank's] rights in the [19 Rutland Square] Property to the right of the Grantee [i.e., the Trust], its successors or assigns, to enforce the conservation and historic preservation purposes of [the Preservation Restriction] Agreement in perpetuity." The lender agreement included several stipulations, one of which would become relevant in the subsequent litigation:

> The Mortgagee/Lender and its assignees shall have a prior claim to all insurance proceeds as a result of any casualty, hazard or accident occurring to or about the Property and all proceeds of condemnation, and shall be entitled to same in preference to Grantee until the Mortgage is paid off and discharged, notwithstanding that the Mortgage is subordinate in priority to the [Preservation Restriction] Agreement.

On their joint return for 2003, the Kaufmans claimed (1) a cash contribution of $16,870 to the Trust (the correct figure

would have been $16,840, see note 2, above, but the Kaufmans attribute the discrepancy to a "typographical error"), and (2) a noncash contribution of $220,800 for the easement donation. They sought the $16,870 cash-contribution deduction on their 2003 returns and, in light of statutory limits on deductions in a single year, 26 U.S.C. § 170(b)(1)(E), spread the deduction for the noncash contribution across their 2003 and 2004 returns. The Kaufmans claimed an additional $3,032 cash contribution to the Trust in 2004.

In March 2007, evidently as part of a wide-ranging investigation into perceived abuses of the easement program, the IRS opened an investigation into the Kaufmans' claimed charitable deductions. On May 5, 2009, the IRS sent a "Notice of Deficiency" to the Kaufmans relating to the 2003 and 2004 tax years. In the Notice, the Service cited three grounds for disallowing the Kaufmans' noncash contribution claim:

> -the Kaufmans had failed to "establish[] that all of the requirements of I.R.C. section 170 and all of the regulations thereunder have been satisfied";
>
> -the contribution "was made subject to subsequent event(s)"; and
>
> -as an "alternative[]" ground, "it has not been established that the value of the contributed property interest was $220,800."

The IRS also disallowed the Kaufmans' claimed cash contribution of $16,870 to the Trust for 2003 "because it was made

-7-

subject to or in contemplation of subsequent event(s)" and calculated that the Kaufmans owed an additional $39,081.25 for 2003 and an additional $36,340.00 for 2004. It also imposed large penalties for underpayment. The Kaufmans petitioned for review by the Tax Court. See 26 U.S.C. § 6213(a) (authorizing petition to the Tax Court for redetermination of deficiency); id. § 7442 (Tax Court jurisdiction).

On an IRS motion for summary judgment, the Tax Court on April 26, 2010, disallowed any deduction for the easement but found "genuine issues of material fact" remained with regard to the cash contribution deduction and the IRS's imposition of penalties. Kaufman v. Comm'r (Kaufman I), 134 T.C. 182 (2010). In a second decision after a trial on the reserved issues, the Tax Court on April 4, 2011, reaffirmed its ruling on the easement, but held that the Kaufmans were entitled to deduct their $16,840 cash contribution on their 2004 return (as opposed to their 2003 return) and were subject only to a small penalty for negligence in taking the deduction in the earlier year. Kaufman v. Comm'r (Kaufman II), 136 T.C. 294 (2011).

Both sides have now appealed to this court. The Kaufmans challenge the disallowance of the deduction for the façade easement; the IRS attacks the disallowance of most of the penalties it had imposed but does not question the Tax Court's allowance of the cash contribution deduction on the 2004 return. Here, the Tax

Court granted partial summary judgment to the IRS "only because . . . Lorna Kaufman's contribution of the facade easement to [the Trust] failed as a matter of law to comply with [relevant regulations]," Kaufman II, 136 T.C. at 325-26, so our review on this issue is de novo.

Our legal analysis begins with § 170, the statute governing deductions for charitable contributions and gifts. Section 170(a) requires that deductions conform to Treasury regulations, and subsequent subsections impose an elaborate list of conditions relating to deductions of different types. Section 170(h) provides in detail for conservation contributions, of which the provisions most pertinent to this appeal require that "a qualified appraisal" be provided, see 26 U.S.C. § 170(h)(4)(B)(iii)(I); cf. § 170(f)(11)(E)(I) (definition of "qualified appraisal"), and that a donated "restriction" on use be "in perpetuity," see § 170(h)(2)(C), (h)(5)(A).

The regulations establish further substantive requirements that conservation contributions must satisfy in order to be deductible (independent of the appraisal requirements that we address separately hereafter). Four provisions relevant here are:

> -Paragraph (g)(1), the "[e]nforceable in perpetuity" requirement, states that "any interest in the property retained by the donor . . . must be subject to legally enforceable restrictions . . . that will prevent uses of the retained interest inconsistent with the conservation purposes of the donation." 26 C.F.R. § 1.170A-14(g)(1).

-Paragraph (g)(2), the mortgage subordination requirement, states that "no deduction will be permitted under this section for an interest in property which is subject to a mortgage unless the mortgagee subordinates its rights in the property to the right of the [donee] organization to enforce the conservation purposes of the gift in perpetuity." 26 C.F.R. § 1.170A-14(g)(2).

-Paragraph (g)(3), the "[r]emote future event" provision, adds a noteworthy qualification to the regulatory requirements: "A deduction shall not be disallowed . . . merely because the interest which passes to, or is vested in, the donee organization may be defeated by the performance of some act or the happening of some event, if on the date of the gift it appears that the possibility that such act or event will occur is so remote as to be negligible." 26 C.F.R. § 1.170A-14(g)(3).

-Paragraph (g)(6), the extinguishment provision, requires that "when a change in conditions give rise to the extinguishment of a perpetual conservation restriction [by judicial proceeding], the donee organization, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction, unless state law provides that the donor is entitled to the full proceeds from the conversion." 26 C.F.R. § 1.170A-14(g)(6)(ii).

These requirements are in addition to the recordkeeping and return regulations of 26 C.F.R. § 1.170A-13, discussed in more detail below.

Paragraph (g)(6). The Tax Court, in denying the Kaufmans a deduction for the façade easement, relied entirely on the last of these requirements. Although the extinguishment

-10-

provision was unexplained when first promulgated, 51 Fed. Reg. 1496, 1505 (Jan. 14, 1986), paragraph (g)(6) appears designed in case of extinguishment both (1) to prevent taxpayers from reaping a windfall if the property is destroyed or condemned and they get the proceeds from insurance or condemnation[3] and (2) to assure that the donee organization can use its proportionate share of the proceeds to advance the cause of historic preservation elsewhere.

The Tax Court's position, briefly stated, was that although the Kaufmans in the Preservation Restriction Agreement governing 19 Rutland Square granted the Trust an entitlement to a proportionate share of post-extinguishment proceeds, thus seemingly complying with the regulation, the lender agreement executed by Washington Mutual undercut this commitment--and so defeated the deduction--by stipulating that "[t]he Mortgagee/Lender and its assignees shall have a prior claim to all insurance proceeds . . . and all proceeds of condemnation, and shall be entitled to same in preference to Grantee until the Mortgage is paid off and discharged." See Kaufman II, 136 T.C. at 299, 313; Kaufman I, 134 T.C. at 185-87.

Certainly the IRS has good reason to assure that the Kaufmans could not recapture the value of what they gave up by

---

[3]As the Kaufmans note, paragraph (g)(6) only applies when the easement is "extinguished by judicial proceeding," 26 C.F.R. § 1.170A-14(g)(6)(I). Accordingly, paragraph (g)(6) does not necessarily entitle the donee organization to a share of casualty insurance proceeds if the easement remains in place.

granting the easement in order to get the deduction; but the Kaufmans had no power to make the mortgage-holding bank give up its own protection against fire or condemnation and, more striking, no power to defeat tax liens that the city might use to reach the same insurance proceeds--tax liens being superior to most prior claims, 1 Powell on Real Property § 10B.06[6] (Michael Allan Wolf ed., Matthew Bender & Co. 2012), including in Massachusetts the claims of the mortgage holder.[4]

The IRS reads the word "entitled" in the extinguishment regulation to mean "gets the first bite" as against the rest of the world, a view the Tax Court accepted in reading "entitled" to mean "ha[s] an absolute right." Kaufman II, 136 T.C. at 313. But a grant that is absolute against the owner-donor is also an entitlement, Black's Law Dictionary (7th ed. 1999) ("entitle" defined as "[t]o grant a legal right to"); Collins English Dictionary (10th ed. 2009) ("to give (a person) the right to do or have something"), and almost the same as an absolute one where

_____

[4]Mass. Gen. Laws ch. 60, § 37 (2010); Carpenter v. Suffolk Franklin Sav. Bank, 346 N.E.2d 892, 899-900 (Mass. 1976); see also United States v. A Certain Parcel of Land with Buildings Thereon Known as Hotel Buckminster, in City of Boston, 59 F. Supp. 65, 68 (D. Mass. 1944) ("Under Massachusetts law, real estate taxes are liens paramount to any mortgage on the real estate."). Such super-priority for tax liens is widespread. Alexander, Tax Liens, Tax Sales, and Due Process, 75 Ind. L.J. 747, 770-71 nn. 129-30 (2000). Likewise, proceeds from condemnation go to satisfy a municipal tax lien "before any payment of damages for such taking is made to any other party." Mass. Gen. Laws ch. 79, § 44A; cf. id. ch. 80A, § 15 (applying provisions of chapter 79 to takings by judicial proceeding).

third-party claims (here, the bank's or the city's) are contingent and unlikely.

Equally important, given the ubiquity of super-priority for tax liens, the IRS's reading of its regulation would appear to doom practically all donations of easements, which is surely contrary to the purpose of Congress. We normally defer to an agency's reasonable reading of its own regulations, e.g., United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 220 (2001), but cannot find reasonable an impromptu reading that is not compelled and would defeat the purpose of the statute, as we think is the case here. Cf. Grunbeck v. Dime Sav. Bank of N.Y., FSB, 74 F.3d 331, 336 (1st Cir. 1996).

In reaching our conclusion, we do not rely on the general provision of paragraph (g)(3) that aims to prevent deductions from being lost by improbable events, 26 C.F.R. § 1.170A-14(g)(3), because, as the Tax Court noted, "[o]ne does not satisfy the extinguishment provision . . . merely by establishing that the possibility of a change in conditions triggering judicial extinguishment is unexpected." Kaufman II, 136 T.C. at 313. Nor do we rest our conclusion on the Kaufmans' expressio unius reading of paragraph (g)(2), for "expressio unius is an aid to construction

and not an inflexible rule," Hewlett-Packard Co. v. Berg, 61 F.3d 101, 106 (1st Cir. 1995).[5]

Paragraph (g)(1).  A provision in the agreement between the Kaufmans and the Trust states that "nothing herein contained shall be construed to limit the [Trust's] right to give its consent (e.g., to changes in the Façade) or to abandon some or all of its rights hereunder."  According to the IRS, this provision is a "blank check" to the Trust "to consent to any type of change, irrespective of its compatibility with the donation's conservation purpose," and so "[t]he easement fails to include restrictions that 'will' prevent uses inconsistent with the conservation purpose as required by [paragraph (g)(1)]."

The D.C. Circuit considered and rejected this same argument in Commissioner v. Simmons, 646 F.3d 6, 10 (D.C. Cir. 2011):

> The clauses permitting consent and abandonment, upon which the Commissioner so heavily relies, have no discrete effect upon

---

[5]The Kaufmans argue that because paragraph (g)(2) deals expressly with subordination and only requires that "the mortgagee subordinate[] its rights in the property to the right of the qualified organization to enforce the conservation purposes of the gift," it is per se improper for the IRS to argue that some other right of the bank--here, to insurance and condemnation proceeds-- should have been subordinated.  But the Kaufmans' argument could be turned against them by reading "conservation purposes" broadly to include the donee organization's right to post-extinguishment proceeds (which, by regulation, must be used to advance "conservation purposes," cf. 26 C.F.R. § 1.170A-14(g)(6)(I)).  As the IRS disclaimed this broad reading of paragraph (g)(2), we need not pursue this issue.

> the perpetuity of the easements: Any donee might fail to enforce a conservation easement, with or without a clause stating it may consent to a change or abandon its rights, and a tax-exempt organization would do so at its peril. . . . [T]his type of clause is needed to allow a charitable organization that holds a conservation easement to accommodate such change as may become necessary to make a building livable or usable for future generations while still ensuring the change is consistent with the conservation purpose of the easement.

Id. (internal quotation marks omitted).

The IRS insists that paragraph (g)(1) is a "reasonable interpretation" of the perpetuity language of 26 U.S.C. § 170(h)(5), and is therefore entitled to deference. See Mayo Found. for Med. Educ. & Research v. United States, 131 S. Ct. 704, 711-13 (2012). Yet the question here is not whether paragraph (g)(1) is reasonable, but whether the IRS's interpretation of that regulation is reasonable. The language of paragraph (g)(1) nowhere suggests the stringent outcome that the IRS seeks to ascribe to it and the consequences of the reading would be to deprive the donee organization of flexibility to deal with remote contingencies.

In addition, the concern posited by the IRS is within its power to control: the IRS's own regulations require that tax-exempt organizations such as the Trust be operated "exclusively" for charitable purposes, 26 C.F.R. § 1.501(c)(3)-1, a requirement that the IRS can enforce against the Trust. See, e.g., Alexander v. "Americans United" Inc., 416 U.S. 752 (1974); Music Square Church

-15-

v. United States, 218 F.3d 1367 (Fed. Cir. 2000). We agree with Simmons that such deductions "cannot be disallowed based upon the remote possibility [that the donee organization] will abandon the easements." 646 F.3d at 10.

Recordkeeping and Reporting Requirements. As a further alternative ground, the IRS argues that the Kaufmans failed to comply with certain recordkeeping and reporting requirements that are imposed by statute, 26 U.S.C. § 170(f)(11), and elaborated in an accompanying regulation, 26 C.F.R. § 1.170A-13. Clauses (c)(3)(ii)(J)-(K) of that regulation require taxpayers who claim easement contribution deductions to obtain a "qualified appraisal" report that explains "[t]he method of valuation used to determine the fair market value" of the contribution and "[t]he specific basis for the valuation." See also Deficit Reduction Act of 1984, Pub. L. No. 369, § 155(a)(1)-(2), 98 Stat. 494, 691 (instructing Treasury Department to promulgate regulations regarding appraisals).

The regulation also requires taxpayers to attach an "appraisal summary" to their returns that includes, inter alia:

> -"[a] description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was contributed," 26 C.F.R. § 1.170A-13(c)(4)(ii)(B);

-16-

-"[t]he manner of acquisition . . . and the date of acquisition of the property by the donor," id. § 1.170A-13(c)(4)(ii)(D);

- "[t]he cost or other basis of the property adjusted as provided [elsewhere in the Code]," id. § 1.170A-13(c)(4)(ii)(E); and

- "[t]he appraised fair market value of the property on the date of contribution," id. § 1.170A-13(c)(4)(ii)(J).

The IRS claims that the method of valuation used by the Kaufmans' appraiser lacked "analytical mooring" and produced an indefensibly inflated valuation; indeed, the IRS concluded that the Kaufmans' contribution claim constituted a "gross valuation misstatement[]," that is, a claim more than 200 percent of the actual value.  See 26 U.S.C. § 6662(h). This is not a frivolous contention.  But the IRS's argument is largely an attempt to convert an inherently factual issue into a set of violations of the procedural requirements of section 1.170A-13 in disregard of their language and purpose.

The procedural regulations requiring an appraisal report and summary are designed to provide information "sufficient to permit [the IRS] to evaluate the [taxpayer]'s reported contribution and monitor and address concerns about overvaluation."  Consol. Investors Grp. v. Comm'r, 98 T.C.M. (CCH) 601, 2009 Tax Ct. Memo LEXIS 294, at *67, 2009 WL 4840246, at *23 (T.C. 2009). But whether the valuation was overstated, grossly or otherwise, is a factual question different from whether the formal procedural requirements

-17-

were met, either strictly or under the "substantial compliance" doctrine which may forgive minor discrepancies.[6]

True, the IRS has identified elements of the Kaufmans' appraisal summary (submitted on Form 8283) that are in technical noncompliance with Treasury regulations. As the IRS rightly points out, "the Form 8283 did not include the date and manner of acquisition of the property purportedly contributed or the cost or other basis of the property." Yet as the Kaufmans explain, they "did not 'acquire' the preservation easement, but created that property interest at the moment they conveyed it to the Trust," and "thus had no 'manner and date of acquisition' and no 'cost or other basis' to report."

Arguably, the Kaufmans should have written "None" or "Not Applicable" in the spaces on the Form 8283 reserved for date of acquisition, method of acquisition, and cost/adjusted basis. But we can hardly agree with the IRS that "[t]hese defects," in no way prejudicial to it in this instance, "doom the appraisal summary." Accord Scheidelman v. Comm'r, Nos. 10-3587 & 10-5316, 2012 U.S. App. LEXIS 12272, at *15-23, 2012 WL 2161155, at *5-7 (2d Cir. June 15, 2012).

---

[6]The substantial compliance doctrine allows taxpayers to overcome technical noncompliance if they make "a showing that the requirement is either unimportant or unclearly or confusingly stated." Prussner v. United States, 896 F.2d 218, 224-25 (7th Cir. 1990) (Posner, J.); see also Volvo Trucks of N. Am., Inc. v. United States, 367 F.3d 204, 210 (4th Cir. 2004); Shotgun Delivery, Inc. v. United States, 269 F.3d 969, 973 (9th Cir. 2001).

One aspect of the IRS position warrants separate mention. The regulations say that an appraiser is not "qualified" if "the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property." 26 C.F.R. 1.170A-13(c)(5)(ii). This argument is closely related to the question of whether the easement was overvalued and, as explained in the next section, the context and proper inferences as to the appraisal require further fact-finding by the Tax Court, so it is not a basis for affirmance of the summary judgment.

For the foregoing reasons, the original Tax Court rationale for disallowing the easement deduction as a matter of law fails, as do the alternative grounds for outright affirmance tendered by the IRS. Accordingly, the grant of partial summary judgment for the IRS must be vacated.[7] Moreover, since the Tax Court's decision not to impose penalties with respect to the Kaufmans' noncash contribution claim depended on the same rationale on which it based its grant of partial summary judgment, Kaufman II, 136 T.C. at 325-26 (namely, paragraph (g)(6)), the Tax Court's

---

[7]At trial, the Tax Court sustained the IRS's disallowance of a $16,840 deduction for Lorna Kaufman's 2003 cash contribution to the Trust, Kaufman II, 136 T.C. at 316, and sustained an accuracy-related penalty (of approximately $1,097) resulting from the 2003 cash contribution deduction, id. at 325. As the Kaufmans do not contest the disallowance of the 2003 cash contribution deduction or the accompanying penalty, our decision to vacate the grant of partial summary judgment does not disturb the Tax Court's conclusions regarding those matters.

-19-

decision not to impose further penalties on the Kaufmans must be vacated as well.

Overstatement of Value. Given our rejection of the Tax Court's readings and the IRS's alternatives, a remand is necessary. As the IRS noted in its brief, "If this Court disagrees with the Tax Court's decision, and does not believe that the decision is justified under the alternative grounds discussed, the case should be remanded so that the Tax Court can consider, in the first instance, the grounds left unaddressed, including the proper value of the easement." At oral argument, counsel for the Kaufmans agreed that it would be appropriate for us to remand the case to the Tax Court to determine the substantive question of value in the first instance.

Section 170(h) does not allow taxpayers to obtain six-figure deductions for gifts of lesser or no value. "The value of the contribution under section 170 in the case of a charitable contribution of a perpetual conservation restriction is the <u>fair market value</u> of the perpetual conservation restriction at the time of the contribution." 26 C.F.R. § 1.170A-14(h)(3) (emphasis added). Whether the deduction claimed by the Kaufmans exceeded fair market value was not decided by the Tax Court.

In its Notice of Deficiency, the IRS stated that the Kaufmans had failed to "establish[] that the value of the [easement] was $220,800 as claimed in the 2003 return." The IRS

did not waive this objection by moving for summary judgment to disallow the easement deduction on other grounds as a matter of law; a summary judgment motion properly includes only such grounds as may be susceptible to disposition without a trial. See, e.g., Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 10-11 (1st Cir. 2012). And, because the value of the gift is a factual issue not decided by the Tax Court, the IRS could not offer the objection here as an alternative ground to sustain the judgment.

But although the Kaufmans claimed that the value of the easement donation was $220,800, the IRS has repeatedly pointed to evidence that the true value of the donation was close to zero. If so, then the Kaufmans would be liable for penalties under 26 U.S.C. § 6662 for substantial understatement of income tax and for substantial or gross valuation misstatements, unless they could show "reasonable cause." The IRS has also argued that the Kaufmans knew or should have known that the value of the easement was minimal, failed adequately to investigate, and so fail to establish a "reasonable cause" defense to misstatement penalties for noncash contribution claims. See id. § 6664(c)(3)(B).

When the Kaufmans donated the easement, their home was already subject to South End Landmark District rules that severely restrict the alterations that property owners can make to the exteriors of historic buildings in the neighborhood. These rules provide that "[a]ll proposed changes or alterations" to "all

-21-

elements of [the] facade, . . . the front yard . . . and the portions of roofs that are visible from public streets" will be "subject to review" by the local landmark district commission. S. End Landmark Dist., Standards and Criteria 2 (rev. Apr. 27, 1999).

Under the Standards and Criteria, property owners of South End buildings have an obligation to retain and repair the original steps, stairs, railings, balustrades, balconies, entryways, transoms, sidelights, exterior walls, windows, roofs, and front-yard fences (along with certain "other features"); and, when the damaged elements are beyond repair, property owners may only replace them with elements that look like the originals. Id. at 2-6. Given these pre-existing legal obligations the Tax Court might well find on remand that the Kaufmans' easement was worth little or nothing.

The Kaufmans' own appraiser, recommended to them by the Trust, acknowledged in his report that "there is much overlap in the restrictions imposed by the [easement] and the pre-existing restrictions imposed on the property, particularly by the Landmark Commission." This may be a substantial understatement. Although the appraiser listed several ways in which the easement's restrictions differed from the landmark district commission's, whether the differences have any economic significance could be disputed.

-22-

For instance, the appraiser noted that the easement agreement would last "in perpetuity" while local ordinances might lapse; but no specific reason was given for expecting this to happen (other than a vague suggestion of "changes in political, economic and aesthetic needs and tastes in a community").  He also said that the Kaufmans would be "subject to the inconvenience of periodic inspections" by the Trust; yet any such inconvenience would be limited by the fact that the agreement explicitly does not give the Trust the right to inspect the <u>inside</u> of the house.  Preservation Restriction Agreement 3 (Dec. 22, 2003).  Whether any of the offered distinctions justify <u>any</u> deduction is a matter for the remand.

The Kaufmans themselves were surprised at the size of the valuation, albeit out of concern that it implied--as it must if the Kaufmans were conveying anything of value--a substantial reduction in the resale value of their home.  In an effort to reassure them, a Trust representative told the Kaufmans that experience showed that such easements did not reduce resale value, and this could easily be the IRS's opening argument in a valuation trial.  The Trust representative explained in pertinent part that

> [i]n areas that are regulated by local historic preservation ordinances and bodies such as Boston historic neighborhoods (including yours) . . . , properties with an easement are not at a market value

-23-

disadvantage when compared to the other properties in the same neighborhood.[8]

As indicated by the large cash contributions required of donors, the Trust had a substantial economic incentive for itself in facilitating such conservation easements; and to this end and because of the 10 percent target for donations, it also had a stake in assuring a high valuation.  Similarly, the appraiser, who admitted receiving fees for a succession of such appraisals for Trust easements, assuredly had an interest in remaining on the list of those recommended by the Trust to potential donors.

The burden in the Tax Court initially rests on the taxpayer to justify his or her deduction.  See Tax Ct. R. Prac. & P. 142(a)(1); see also INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84 (1992).  The burdens and presumptions relating to penalties are more complicated, compare, e.g., 26 U.S.C. § 7491(c), with Higbee v. Comm'r, 116 T.C. 438, 446-47 (2001), and there is no reason to pursue the subject of the Kaufmans' fault before determining first whether their deduction was legitimate.  Judging from the amici, the present appeals have the hallmarks of a test case to settle

---

[8]The Kaufmans have objected to the admission of this e-mail into evidence on grounds of hearsay, relevance, and noncompliance with the expert witness requirements of Rule 143(g) of the Tax Court Rules of Practice and Procedure.  While the Trust representative's testimony may not be admissible for the purpose of proving the value of the easement (or lack thereof), it may well be relevant to the question of whether the Kaufmans acted in "good faith," and at trial the Tax Court admitted the e-mail into evidence for that purpose.

larger issues between the industry and the IRS; and on remand the Kaufmans and the IRS could well work out a settlement without a trial.

Doubtless it is the desire to avoid such trials, as well as the difficulty of detecting and investigating suspicious cases one by one, that explains the IRS's aggressive legal positions in this case. And, despite our rejection of those particular positions, we do not question the IRS's concern, transcending this case, that individuals and organizations have been abusing the conservation statute "to improperly shield income or assets from taxation." IRS News Release IR-2005-19 (Feb. 28, 2005), see also IRS News Release IR-2006-25 (Feb. 7, 2006) (repeating language from 2005 news release).

However, to reject overly aggressive IRS interpretations of existing regulations is hardly to disarm the IRS. Without stifling Congress' aim to encourage legitimate easements, one can imagine IRS regulations that require appraisers to be functionally independent of donee organizations, curtail dubious deductions in historic districts where local regulations already protect against alterations, and require more specific market-sale based information to support any deduction. Forward looking regulations also serve to give fair warning to taxpayers.

If taxpayers still do not get the message, the penalties regime is formidable, see, e.g., 26 U.S.C. § 6662(h)(1) (40 percent

-25-

penalty for gross valuation misstatements); and, for willful abusers, there are criminal penalties, e.g., 26 U.S.C. § 7201 (prison term up to five years). The Justice Department has already secured a permanent injunction against the Trust to prohibit some of the practices alluded to in this case.[9] The IRS is properly zealous to protect the revenues and over the long run it has the tools to do so.

The judgment of the Tax Court is <u>vacated</u> except with regard to the deductibility of the taxpayers' cash contributions and the accuracy-related penalty associated with their 2003 cash contribution claim, and the matter <u>remanded</u> to that court for further proceedings consistent with this decision. Each side shall bear its own costs on this appeal.

It is so ordered.

---

[9]<u>See</u> Stipulated Order of Permanent Injunction, <u>United States</u> v. <u>McClain</u>, No. 11-1087 (D.D.C. July 15, 2011), which <u>inter alia</u> prevents the Trust from claiming that the IRS has recognized a "safe harbor" for easement valuations in the 10-15 percent range and from "[p]articipating in the appraisal process for a conservation easement in any regard, including but not limited to recommending . . . any appraiser . . . or list of appraisers" beyond furnishing a list of all appraisers who have been certified to appraise conservation easements by a professional organization.