T.C. Memo. 2020-3

UNITED STATES TAX COURT

CHAD LOUBE AND DANA M. LOUBE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5092-17.                     Filed January 8, 2020.

Chad Loube and Dana M. Loube, pro sese.[*]

<u>Scott A. Hovey</u> and <u>Deborah Aloof</u>, for respondent.

MEMORANDUM OPINION

COPELAND, <u>Judge</u>:  In a notice of deficiency dated December 2, 2016, respondent determined a deficiency of $117,612 in Federal income tax for petitioners' 2013 taxable year.  Pending before this Court is respondent's motion

_____

[*]Brief amici curiae was filed by <u>Thomas J. O'Rourke</u> and <u>Derek P. Roussillon</u> as attorneys for Second Chance, Inc.

[*2] for summary judgment filed pursuant to Rule 121.[1]  Respondent has moved

for summary judgment on the grounds that, by operation of the documents so far

contained in the record, there are no genuine disputes as to material facts and this

case should therefore be ruled on now as a matter of law.

Petitioners filed both a response to the motion for summary judgment and a

first supplement to their response.

Because we find no genuine dispute as to any material fact, and because we

find that petitioners neither strictly nor substantially complied with the

requirements of section 155 of the Deficit Reduction Act of 1984 (DEFRA), Pub.

L. No. 98-369, 98 Stat. at 691, we will grant respondent's motion.

Background

Petitioners resided in Maryland when they filed their petition.  On or about

July 1, 2013, petitioners purchased real property in Potomac, Maryland.  The

property was purchased for $795,000 and consisted of 0.38 acres of land and a

single-family house.  Petitioners desired to demolish the house and construct in its

place a new residence of their own design.

---

[1]Unless otherwise indicated, rule references are to the Tax Court Rules of Practice and Procedure and section references are to the Internal Revenue Code in effect for the year in issue.

**[*3]** Second Chance, Inc. (Second Chance), is incorporated under the laws of Maryland and qualifies as a charitable organization under section 501(c)(3). Second Chance performs deconstruction, which is something less than demolition. Where demolition typically results in annihilation of a structure, deconstruction might involve only the removal of furniture, appliances, fixtures, lumber, and other materials. Second Chance sells salvageable material from deconstruction on the open market through its warehouse. But Second Chance's raison d'être is to use the deconstruction process to teach marketable skills to persons facing barriers to employment ranging from limited education to criminal records while environmentally reusing materials that would otherwise end up as landfill debris.

Typically, at the stage where the decision has been made to demolish a structure, the owner will enter into an agreement with Second Chance to allow Second Chance to use the structure for deconstruction. The owner will also make a cash contribution to Second Chance, which covers the upfront costs of Second Chance's deconstruction. Once Second Chance has finished its training and removed salvageable materials, the owner will engage a third party to demolish the structure.

Second Chance contacted petitioners via email on May 3, 2013, explaining its deconstruction program. The email noted that a contribution would generate a

[*4] tax deduction and included a "Tax Strategy Planning Worksheet". It further noted that a demolition company would still have to be engaged and that the demolition company's cost would be constant in the project.[2]

On July 1, 2013, petitioners engaged an appraiser, Patrick M. Smith, Sr., of NoVaStar Appraisals, Inc.

On or about July 16, 2013, petitioners and Second Chance entered into an "Agreement for Charitable Contribution", relating to deconstruction, and petitioners signed a "Charitable Pledge Agreement", relating to making a cash contribution. The agreement incorporated by reference the pledge and included the following terms:

> WHEREAS, Owner desires to contribute to Second Chance the existing improvements, buildings, and fixtures upon such Premises (collectively the "Improvements"), which such Improvements shall be treated as personally severed from the Premises, for the express purpose of Second Chance using the Improvements in its charitable operations[.]
>
> \* \* \* \* \* \* \*
>
> 2. Donation; Conveyance of Improvements. Owner hereby donates, conveys and gives to Second Chance all of the Owner's right, title and interest in the Improvements and Second Chance hereby accepts such Improvements. The parties intend for the Improvements to be

---

[2]The parties in this case appear to agree that Second Chance's deconstruction did not appreciably reduce petitioners' demolition costs.

[*5] treated as personalty and desire by this Agreement to effectuate a constructive severance of the Improvements from the Premises.

Aside from the "Improvements" referenced above, the agreement did not specify what items, objects, or property were being donated. The agreement was not recorded. The pledge included petitioners' commitment to donate to Second Chance $27,500 on or before December 31, 2013. The pledge was marked with a handwritten slash across the front with the word "Renegotiated" underlined and in all caps in its upper right hand corner.

Mr. Smith sent petitioners an appraisal for the property by letter dated July 17, 2013. The appraisal had an effective date of July 1, 2013, and used a "Cost Approach to Value", which involved estimating "the current costs to reproduce or create a property with another of comparable use and marketability." The appraisal included 99 detailed photos of the home and personal property inside the home before removal through deconstruction. The appraisal used data from the R.S. Means Co., which specializes in construction cost estimating data, in order to calculate that the current cost to reproduce the house would be $674,000. The appraisal then reduced that amount for the costs of labor, architectural fees, the general condition of the house, and the overhead and profit for a hypothetical construction company, which resulted in a "new materials cost" for the house of

[*6] $330,453.  The new materials cost of $330,453 was then reduced by 10% for depreciation (i.e., a reduction of $33,045.30).  The new materials cost, less the total depreciation, resulted in a rounded fair market value for the deconstructed house of $297,000.  To come to the initial value of $674,000, the appraisal listed categories of donated items as follows:

| | |
|---|---|
| Site work | $1,750 |
| Foundations | 34,700 |
| Framing | 48,616 |
| Exterior walls | 55,378 |
| Roofing | 11,100 |
| Interiors | 97,360 |
| Specialties | 182,718 |
| Mechanical | 25,073 |
| Electrical | 11,025 |
| **Subtotal** | **$467,720** |
| General conditions | 46,500 |
| G.C. O&P | 77,000 |
| Architectural fee | 35,500 |
| Contractor fee | $47,000 |
| **Estimate total** | **$673,720** |
| (rounded) | **$674,000** |

[*7]   Each of the categories above had detailed component valuations such as that for the category labeled "specialties", which included:

| Description | Ext. Total incl O&P |
|---|---|
| Refrigerator, no frost, 21-29 C.F | $3,350 |
| Garbage disposal | 278 |
| Garage door opener | 580 |
| Gable dormer, 2' x 6' roof frame | 57,000 |
| Water heater, gas, glass lined 50 gal. | 1,500 |
| Microwave oven | 650 |
| Range 30" free standing, 1 oven | 1,876 |
| Heating systems, hot water | 5,300 |
| Fireplace & chimney | 8,925 |
| Smoke detector | 700 |
| Half bath – including plumbing, wall and floor finishes | 5,428 |
| Full bath – including plumbing, wall and floor finishes | 19,000 |
| Upgrade kitchen cabinets | 27,600 |
| Two car attached garage | 28,100 |
| Dishwasher, built-in, 4 or more cycles | 1,378 |
| Kitchen, custom grade | 16,900 |
| Sinks, porcelain on CI single bowl, double bowl, 20" x 32" | 1,800 |
| Water heater, gas, 75 gal. | 1,975 |
| Medicine chest with mirror, 36" x 24" | 378 |
| **Totals for 07 Specialties** | **$182,718** |

**[*8]**  In addition, appendix E of the appraisal listed the most recent tax information for the property, which included a total assessed value for 2013 of $759,400, consisting of a land value of $451,200 and an improvements value of $308,200.

On or about December 23, 2013, petitioners issued a check to Second Chance for $15,000.

Petitioners contracted with Design-Tech Builders, Inc. (Design-Tech), on January 10, 2014, for the construction of a new single-family house on the property.  That contract authorized Design-Tech to subcontract for the demolition of the house and construction of a foundation for a new house.  On or before February 24, 2014, Design-Tech hired Modern Foundations, Inc., to demolish and remove the existing structure at a bid price of $14,500.

Petitioners timely filed their 2013 Federal income tax return, claiming a $297,000 noncash charitable contribution deduction for their donation of the improvements to Second Chance.  Petitioners attached to their 2013 return a Form 8283, Noncash Charitable Contributions (appraisal summary).  On the appraisal summary, Section B, Part I, Block 4(j) is checked, identifying the type of property donated as "Other".  Block 5(a), which asks for a description of the donated property, states "House Imporvements [sic]".  Block 5(b) says "Excellent" where it

**[*9]** asks for a summary of the overall physical condition of the property, if tangible property was donated. Block 5(c) appraises the improvements at a fair market value of $297,000. Blocks 5(d) through 5(i), which provide critical information related to the donation, are all blank. In particular, Block 5(d), which asks for the date that the donated property was acquired, is blank; and Block 5(f), which asks for the donor's cost or adjusted basis, is blank. Part III, Declaration of Appraiser, is not signed by the appraiser but is dated and shows the appraiser's address and his identifying number. Second Chance is listed under Part IV, Donee Acknowledgment; its address and identifying number are reported, but the "Authorized signature" block is blank.[3] The only other information in the appraisal summary is petitioners' names and identifying numbers at the top of each page. Petitioners did not provide any explanation for the blank portions of the appraisal summary, but they did attach the appraisal to the return.

Respondent issued the notice of deficiency, determining that petitioners were not entitled to the $297,000 noncash charitable contribution deduction. The Internal Revenue Service (IRS) examiner's Form 886-A, Explanation of Adjustments, stated that the reason the noncash charitable contribution deduction

---

[3]Respondent indicates that petitioners filed their 2013 return electronically and at some point appear to have provided respondent with a Form 8283 that was properly signed and dated.

[*10] was being disallowed was that there were "no official appraisals for the individual items that were donated after the deconstruction of the house once the individual components were taken apart." Quoting section 1.170A-1(c)(2), Income Tax Regs., the examiner pointed out that the fair market value of a noncash charitable contribution is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Therefore, "[t]he appraisal should have been done for each individual item that was donated after it was detached from the home contemporaneously, since that would be the true value of the piece that is being donated."

Petitioners then instituted this action for redetermination by timely filing their petition.

Discussion

I.    Burden of Proof

Summary judgment serves to "expedite litigation and avoid unnecessary and expensive trials." Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). It is not, however, a substitute for trial and should not be used to resolve genuine disputes over issues of material fact. See Vallone v. Commissioner, 88 T.C. 794, 801-805 (1987). The Court may grant summary judgment when there is no

[*11] genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). The moving party has the burden of showing the absence of a genuine dispute as to any material fact. FPL Grp., Inc. v. Commissioner, 115 T.C. 554, 559 (2000); Bond v. Commissioner, 100 T.C. 32, 36 (1993); Naftel v. Commissioner, 85 T.C. 527, 529 (1985). For these purposes we afford the party opposing the motion the benefit of all reasonable doubt, and we view the material submitted by both sides in the light most favorable to the opposing party. Sundstrand Corp. v. Commissioner, 98 T.C. at 520. That is, we resolve all doubts as to the existence of a dispute as to any material fact against the movant. Id.; see, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). However, where the moving party properly makes and supports a motion for summary judgment, the opposing party "may not rest upon the mere allegations or denials of such party's pleading" but must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d).

## II. Respondent's Arguments

Respondent makes three principal arguments for why he should be granted summary judgment. First, respondent argues that petitioners are barred from deducting a charitable contribution for 2013 because their appraisal summary

[*12] omitted information required by DEFRA sec. 155(a)(1) and (2). Specifically, respondent cites the appraisal summary's failure to include the date the donated property was acquired or its cost basis, as well as its purporting to donate items of tangible property yet valuing the entire house (less certain construction, overhead, profit, and depreciation costs).

Second, respondent argues that the appraisal is not a qualified appraisal within the meaning of section 170(f)(11)(E) because it did not appraise the property that petitioners actually donated. According to respondent, even if petitioners had complied fully with the DEFRA sec. 155 appraisal summary requirements, the appraisal itself nevertheless failed because it determined a depreciated cost for rebuilding the entire house rather than valuing the individual items actually removed by Second Chance. That is, according to respondent, the appraisal fails because it valued the house while petitioners donated only some parts of the house--the parts removed and taken to Second Chance's warehouse. According to respondent, section 170(f)(11)(E)(i) provides that "[t]he term 'qualified appraisal' means, with respect to any property, an appraisal of such property" (emphasis added), and petitioner's appraisal fails to identify such property donated.

[*13] Respondent further contends that petitioners can never identify the specific property donated because "[n]o record exists indicating the scope of Second Chance's deconstruction work on the property or what specific items Second Chance salvaged therefrom" and "[n]o witness is available to testify that can explain what items were actually salvaged from the property." The only evidence currently supporting respondent's third claim appears to be respondent's citation of the declaration of Scott A. Hovey in support of respondent's motion for summary judgment. Mr. Hovey, who is respondent's counsel, based his declaration on his own review of respondent's administrative files.

Lastly, respondent alternatively argues that even if the appraisal is qualified, petitioners gave a partial interest in property, for which a deduction is generally prohibited under section 170(f)(3).

III.    Petitioners' Arguments

Petitioners argue that they engaged a professional third-party appraiser, attached the appraisal summary to their return, and attached the actual appraisal to their return. Furthermore, petitioners contend they were merely trying to value the house in a way that appeared consistent with IRS policy at the time and that any disagreement over the valuation method selected by a professional appraiser does not change the identity of the property donated. Petitioners have not raised, and so

**[*14]** we do not address, reasonable cause under section 170(f)(11) as a defense for failure to satisfy regulatory reporting requirements.

Petitioners also argue that respondent's declaration, which claims that the actual property donated can never be identified, is inadmissible because Rule 121(d) requires that "[s]upporting and opposing affidavits or declarations shall be made on <u>personal</u> <u>knowledge</u>, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant or declarant is competent to testify to the matters stated therein." (Emphasis added.) Petitioners assert that respondent fails to identify with specificity what provisions of DEFRA were not satisfied, and they point to the generality of respondent's assertion that the "lack of clarity in the Appraisal as to what property was donated has a cascading effect on the other appraisal requirements." Petitioners also cite, as evidence for specificity, the 60-plus page appraisal.

Lastly, petitioners argue that they did not give a partial interest to Second Chance but rather that they gave an entire interest in the improvements to the land. Petitioners rely primarily on two Maryland cases to support this position. The first is cited for the proposition that parties are permitted to agree to sever fixtures, including buildings, from real property. <u>Walker v. Schindel</u>, 58 Md. 360, 368 (1882). The second is cited for the proposition that "a person who owns both

**[*15]** realty and fixtures upon the realty may effect a constructive severance of the fixtures". <u>Bohle v. Thompson</u>, 554 A.2d 818, 824 (Md. Ct. Spec. App. 1989).

## IV.    Analysis

Because we will rule on the basis of DEFRA, we need not and do not address respondent's second and third arguments or petitioners' associated rebuttals.

### A.    Whether Petitioners Complied With DEFRA Sec. 155

Section 170(a)(1) allows as a deduction any charitable contribution made within the taxable year. If the taxpayer makes a charitable contribution of property other than money, the amount of the contribution is generally equal to the fair market value of the property at the time of contribution. <u>See</u> sec. 1.170A-1(c)(1), Income Tax Regs.

Where a contribution of property (other than publicly traded securities) is valued in excess of $5,000, the taxpayer must "obtain[] a qualified appraisal of such property and attach[] to the return * * * such information regarding such property and such appraisal as the Secretary may require." Sec. 170(f)(11)(c). The required information includes "an appraisal summary" that must be attached "to the return on which such deduction is first claimed for such contribution". DEFRA sec. 155(a)(1)(B); <u>see</u> sec. 1.170A-13(c)(2), Income Tax Regs.

**[*16]** Specifically, DEFRA sec. 155(a)(1) directed the Secretary to promulgate regulations requiring a taxpayer claiming a deduction for a noncash charitable contribution

(A) to obtain a qualified appraisal for the property contributed,

(B) to attach an appraisal summary to the return on which such deduction is first claimed for such contribution, and

(C) to include on such return such additional information (including the cost basis and acquisition date of the contributed property) as the Secretary may prescribe in such regulations.

Section 1.170A-13(c)(4), Income Tax Regs., then defines the necessary elements of an "appraisal summary". Those elements include, among others, "[a] description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was contributed", "[t]he manner of acquisition (e.g., purchase, exchange, gift, or bequest) and the date of acquisition of the property by the donor", and "[t]he cost or other basis of the property". Sec. 1.170A-13(c)(4)(ii)(B), (D), (E), Income Tax Regs. The "appraisal summary" is a summary of a qualified appraisal which must be made on a Form 8283, and that form must be attached to the return. Sec. 1.170A-13(c)(4)(i)(A), Income Tax Regs. Failure to meet the required elements of an appraisal summary generally

[*17] results in a disallowed deduction unless a taxpayer "has reasonable cause for being unable to provide the information * * * relating to the manner of acquisition and basis of the contributed property" and attaches "an appropriate explanation" to the appraisal summary. Id. subdiv. (iv)(C)(1).

We conclude that petitioners failed to strictly comply with DEFRA sec. 155 and the regulations thereunder because they failed to provide, among other information, the basis and the acquisition date of the contributed property on the appraisal summary. Petitioners also failed to attach to the appraisal summary an explanation of reasonable cause for their inability to provide the basis, acquisition date, or other information related to the contributed property.

B.    Whether Petitioners Substantially Complied With DEFRA Sec. 155

Petitioners contend that while they may not have strictly complied with the requirements of DEFRA sec. 155, they nevertheless substantially complied with its requirements. This Court recognizes the doctrine of substantial compliance. See RERI Holdings I, LLC v. Commissioner, 149 T.C. 1, 15-16 (2017), aff'd sub nom. Blau v. Commissioner, 924 F.3d 1261 (D.C. Cir. 2019). Under that doctrine the key question is whether the requirements relate "to the substance or essence of the statute." Bond v. Commissioner, 100 T.C. at 40-41 (quoting Taylor v. Commissioner, 67 T.C. 1071, 1077 (1977)). If the requirements do relate to the

**[\*18]** substance or essence of the statute, then strict adherence to the statutory and regulatory requirements is mandatory. See Dunavant v. Commissioner, 63 T.C. 316, 319-320 (1974). If the requirements are instead procedural or directory, then the requirements may be fulfilled by substantial compliance. RERI Holdings I, LLC, v. Commissioner, 149 T.C. at 15-16.

We held in Bond v. Commissioner, 100 T.C. at 41-42, that some of the reporting requirements of section 1.170A-13, Income Tax Regs., are directory and require only substantial compliance. Because the reporting requirements are directory, a taxpayer who fails to strictly comply but "substantially complies" with section 1.170A-13, Income Tax Regs., is still entitled to the deduction. Nevertheless, there may still be an element(s) which is so essential to the purpose of the regulation that one can never fail to comply with it in form and still comply in substance with the regulation. See Bond v. Commissioner, 100 T.C. at 41; see also Belair Woods, LLC v. Commissioner, T.C. Memo. 2018-159, at \*15-\*17. Substantial compliance is not meant to excuse all failures. Instead, it is used where "the taxpayers had provided most of the information required" or made omissions "solely through inadvertence." Hewitt v. Commissioner, 109 T.C. 258, 265 & n.10 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998); see Durden v. Commissioner, T.C. Memo. 2012-140, 2012 WL 1758655, at \*2

**[\*19]** ("The doctrine of substantial compliance is designed to avoid hardship in cases where a taxpayer does all that is reasonably possible, but nonetheless fails to comply with the specific requirements of a provision."). Thus, it is a doctrine that is not "liberally applied." Costello v. Commissioner, T.C. Memo. 2015-87, at \*23 (quoting Alli v. Commissioner, T.C. Memo. 2014-15, at \*54); see, e.g., Mohamed v. Commissioner, T.C. Memo. 2012-152, 2012 WL 1937555, at \*10 ("[T]he problems of misvalued property are so great that Congress was quite specific about what the charitably inclined have to do to defend their deductions[.]"); see also Kaufman v. Shulman, 687 F.3d 21, 29 (1st Cir. 2012) (stating that the substantial compliance doctrine may be used to forgive "minor discrepancies" in the taxpayer's reporting), aff'g in part, vacating and remanding in part 136 T.C. 294 (2011), and 134 T.C. 182 (2010); Prussner v. United States, 896 F.2d 218, 224 (7th Cir. 1990) (stating that the substantial compliance doctrine "should be interpreted narrowly").

If petitioners can substantially comply with section 1.170A-13, Income Tax Regs., then we must decide whether they did. We have stated that the test for substantial compliance is whether the donors "provided sufficient information to permit \* \* \* [the Commissioner] to evaluate their reported contributions, as intended by Congress." Smith v. Commissioner, T.C. Memo. 2007-368, 2007 WL

**[\*20]** 4410771, at \*19, aff'd, 364 F. App'x 317 (9th Cir. 2009). Petitioners' appraisal summary omitted much of the required information and provided no reasonable cause explanation for the omissions.

We have recently held that a taxpayer who fails to disclose "cost or adjusted basis" on its appraisal summary has failed to substantially comply with section 1.170A-13, Income Tax Regs. RERI Holdings I, LLC v. Commissioner, 149 T.C. 1. We decided so because Congress specifically enacted DEFRA's heightened reporting requirements in order to combat inflated charitable deductions by requiring, where reasonably obtainable, the disclosure of "cost or adjusted basis" to "facilitate the Commissioner's efficient identification of overvalued property." Belair Woods, LLC v. Commissioner, at \*17. Thus, a taxpayer's failure to provide the "cost or adjusted basis" on an appraisal summary is a failure to substantially comply with DEFRA sec. 155 because it is a failure to "provide[] sufficient information to permit \* \* \* [the Commissioner] to evaluate the[] reported contributions, as intended by Congress." Smith v. Commissioner, 2007 WL 4410771, at \*20; see also Belair Woods, LLC v. Commissioner, at \*15-\*20.

In RERI Holdings I, LLC v. Commissioner, 149 T.C. at 2-3, a partnership acquired and donated a future interest in commercial property to a university. The partnership claimed a $33,019,000 charitable contribution deduction on its

**[\*21]** informational return.  Id.  The partnership attached to its return a complete appraisal as well as an appraisal summary.  Id. at 7.  However, the appraisal summary left blank the space for the donor's cost or adjusted basis and provided no explanation for the omission.  Id.  We held in RERI that the omission of basis from an appraisal summary prevents the appraisal summary from achieving its intended purposes and cannot be excused by substantial compliance.  Id. at 16-17.

In Belair Woods, LLC v. Commissioner, at \*3-\*5, a limited liability company (Belair) entered into a deed of conservation easement with a land trust.  The easement covered 141.15 acres of land.  Id.  Belair claimed a resulting charitable contribution deduction of $4,778,000 on its tax return.  Id. at \*5-\*6.  Belair attached an appraisal summary which did not state the cost or the adjusted basis of the property contributed.  Id. at \*6-\*7.  Belair also attached a letter indicating that it did not state the basis because "the basis of the property is not taken into consideration when computing the amount of the deduction."  Id. at \*7.  The Court found that Belair did not strictly comply with the regulatory requirement because the appraisal summary did not report the basis and the attached letter failed to provide a sufficient explanation showing why Belair was unable to provide that information.  Id. at \*11-\*12.

[*22] Belair's tax matters partner argued that the disclosure in the return had substantially complied because Belair's cost basis in the conservation easement could be effectively derived from several attachments to its partnership tax return: (1) a Schedule L, Balance Sheets per Books; (2) a Schedule M-1, Reconciliation of Income (Loss) Per Books With Income (Loss) Per Return; (3) a section 743(b) election and calculation sheet; and (4) the attached appraisal. Id. at *19. We rejected the tax matters partner's argument because supplying the cost or adjusted basis on the appraisal summary goes directly to the essence of statute. Id. at *15-*16 (citing Bond v. Commissioner, 100 T.C. at 41).

Petitioners contend that attaching the full appraisal to their return provided the necessary information such that they substantially complied. We are not swayed. While it may have been possible for the Commissioner to glean sufficient information from the purchase price and tax information listed in the appraisal, that does nothing to change the fact that Congress specifically passed DEFRA's heightened substantiation requirements so that the Commissioner could efficiently flag properties for overvaluation from the face of appraisal summaries. In so doing, Congress wanted precisely to prevent the Commissioner from having to sleuth through the footnotes of millions of returns. "The IRS reviews millions of returns each year for audit potential, and the disclosure of cost basis on the Form

**[\*23]** 8283 itself is necessary to make this process manageable. Revenue agents cannot be required to sift through dozens or hundreds of pages of complex returns looking for clues about what the taxpayer's cost basis might be." Belair Woods, LLC v. Commissioner, at \*20. "If cost basis is not explicitly disclosed where it is required to be disclosed, the Commissioner will be handicapped in identifying suspicious charitable deductions and deterring taxpayers from 'continu[ing] to play the "audit lottery."'" Id. (quoting S. Prt. No. 98-169 (Vol. 1), at 444 (1984)). That is why we ruled as we did in RERI and Belair Woods and why we rule as we do now.

To reflect the foregoing, respondent's motion for summary judgment will be granted.

An appropriate order and

decision will be entered.